UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE L. SAMANIEGO,<br><br>                                    Petitioner,<br><br>          v.<br><br>B. CATES, Warden, et al.,<br><br>                                    Respondents. | Case No.:  3:23-cv-0188-JES-AHG<br><br>**ORDER:**<br><br>**(1) DENYING PETITION FOR A WRIT OF HABEAS CORPUS**<br><br>**(2) DENYING PETITIONER'S ANCILLARY REQUESTS [ECF No. 1-2]**<br><br>**(3) DENYING CERTIFICATE OF APPEALABILITY** |

Presently before the Court is a Petition for a Writ of Habeas Corpus filed under 28 U.S.C. § 2254 by Jose L. Samaniego ("Petitioner"), a state prisoner proceeding pro se and in forma pauperis. ECF No. 1. Respondent has filed an Answer and lodged the state court record. ECF Nos. 13, 14. Petitioner has not filed a Traverse.[1] *See* ECF Nos. 20, 21.

---

[1] Although this case was referred to United States Magistrate Judge Allison H. Goddard pursuant to 28 U.S.C. § 636(b)(1)(B), the Court has determined that neither a Report and Recommendation nor oral argument are necessary for disposition of this matter. *See* S.D. Cal. CivLR 71.1(d).

## I.   FACTUAL AND PROCEDURAL BACKGROUND

The following is taken from the state appellate court opinion affirming the judgment in *People v. Samaniego*, D076709 (Cal. Ct. App. Oct. 19, 2021). *See* ECF No. 14-46. The state court factual findings are presumptively correct and entitled to deference in these proceedings. *See Sumner v. Mata*, 449 U.S. 539, 545-47 (1981).

*The People's Case*

In January 2001, Edgar lived in the San Diego area with his family and was dating Gloria I., [footnote: Gloria I. was Gloria O. before she was married.] who lived in the Encanto area. Gloria had a one-year-old and a two-year-old with Aranda. Gloria and Aranda were on-again, off-again, and in January 2001, they were both dating other people, and she lived alone with their children. Aranda was aware Gloria was seeing Edgar, but he was also trying to work things out with her.

Gloria lived in a home situated below another house. To access her home, a person had to walk down the side of the main house, then down 15-20 steps to her home. Gloria's door was about five steps to the right of the bottom of the stairs; the street was not visible from her front door. [¶] Aranda's grandmother lived next door to Gloria, and he lived nearby. He spent a lot of time at his grandmother's house, visiting her daily, and he visited Gloria frequently as well. [¶] Edgar was not familiar with Gloria's neighborhood, but he would stop at her house to give her rides, and he bought things for her, like food and diapers.

Not long before the shooting, Edgar and Aranda ran into each other in front of Aranda's grandmother's house. There was no physical interaction, but Edgar stepped out of his car, and Gloria pulled him back inside. Edgar testified that Aranda had seemed to appear out of nowhere, and when he told Gloria he did not want any problems, she said there would be none.

On January 27, 2001, Edgar spent time with his friend Alex. They used Edgar's car, with Alex driving because he liked the vehicle. Edgar did not have a cell phone, so he used Alex's phone to call Gloria and tell her that he was on his way to her home. [¶] Gloria did not want Edgar to stop by because Aranda was there, but Edgar said he was coming anyway. Aranda left Gloria's to ask his mother if she could babysit that night. [¶] Alex parked across the street from Gloria's house, and Edgar told him to stay in the car. Aranda knew what kind of car Edgar drove, and he saw a car

2

resembling Edgar's near Gloria's house. He was concerned he might get jumped by Edgar and anyone with him, so Aranda went to look for someone to back him up.

Aranda drove six to eight blocks away, where he saw a group in the street in front of the elementary school. He stopped to ask Palomino if he would back up Aranda. He told Palomino he wanted Palomino to come in case there was more than one guy. Palomino got into Aranda's car, and Samaniego got in the car, too. Aranda did not know Samaniego, but he had seen him in the neighborhood, where Samaniego was known as "Pelón," which means "bald," a nickname Samaniego had from the time he was a baby because he did not have a lot of hair.

Aranda drove back to Gloria's house with Palomino and Samaniego and parked catty corner from the house. Aranda told the other two to wait and have his back. Then he exited his vehicle and walked down the stairs to Gloria's house. [¶] While Aranda was gone, Edgar went to see Gloria. Gloria told him she did not want any problems, and she told him she was trying to get back together with Aranda. [¶] Aranda and Edgar ran into each other on the stairs outside Gloria's home. The two men exchanged words; Edgar told Aranda he understood that this was Aranda's family, that Aranda could have Gloria, and he was leaving. Aranda replied, "Okay, Cool. Everything's cool." The two shook hands, then Edgar walked back up the stairs.

*Edgar's Testimony About the Shooting*

Edgar testified that after he and Aranda shook hands, Aranda did not seem angry with him or threaten him. He walked up the stairs toward his car, and Aranda followed behind. When Edgar reached the top of the stairs, he saw two "youngsters" or "peewees" standing in front of the house. One of them said, "East side," as Edgar passed them. Edgar turned as if to say, "What?" then laughed and kept walking. The person said, "East Side Rascals," or something similar again, and Edgar turned toward them. Edgar had interpreted the statement to mean the person talking was in a gang, and when he turned, one said, "This is what's up," with a gun pulled out, pointed at Edgar. The person holding the gun began firing the weapon. Edgar saw Aranda behind the two youngsters, but then Aranda vanished or took off running when the shooting started.

Bullets hit Edgar in the chest, so he began running toward the car Alex was driving and jumped in through the passenger side window. When he looked back, he saw the shooter was still shooting. He heard the two males running, and he could hear more shots, so he told Alex to go. Alex put the car into drive and plowed into a house one or two doors down. Edgar hit his head during the crash and was knocked out. After he came to, he went to the front door of the house and knocked. He was bleeding and gasping for air, and he called out that he had been shot, then he collapsed inside the home.

*The Injuries*

Alex suffered an inoperable gunshot wound to the head, resulting in his death. [¶] Edgar suffered three gunshot wounds. One was in his chest. A second wound was to his right flank, and it lodged in his abdomen. Doctors performed surgery to determine the extent of the damage, and they discovered the gunshot to the chest lacerated the liver and the diaphragm, and the gunshot to the flank lacerated the bottom half of the right kidney and lodged near the spine. He suffered bleeding in the chest and blood clotting, which required a second surgery six days after the first one. A third bullet was discovered lodged in his arm, near the wrist, about 18 months after the shooting.

*Edgar's Descriptions of the Perpetrators*

When Gloria visited Edgar in the hospital, he told her he thought Aranda was involved. [¶] Edgar described the shooter as Hispanic and the other male as possibly mixed race or Puerto Rican. He said the shooter had slicked-back, collar-length hair and was probably about five foot, eight inches tall. He remembered the shooter wearing a long-sleeved black sweater with two gray stripes across the chest area and both sleeves. He estimated the shooter's age at 16 or 17. [¶] He said the second suspect was taller than the first one and had short or shaved hair, like a fade. He said this suspect was heavier than the shooter. [¶] Edgar worked with police to develop a composite drawing. The composite does not show someone with collar-length hair because Edgar remembered that later. Edgar testified the suspects were clean-shaven, but in the composite the suspects were not.

Although Edgar spoke with police in 2001, he did not remember talking to them immediately following the shooting or initially telling an

officer that Aranda shot him or later saying that it was Aranda's homeboys who shot him. He remembered telling an officer that one of the suspects said something like "East San Diego" before shooting him.

### Gloria's Testimony about the Shooting

After the two men shook hands and Edgar left, Gloria remembered Aranda following her into her house, where they talked. She could not remember one way or the other if Aranda was with her when she heard the gun shots. [¶] After the shooting stopped, she ran up the stairs to see what happened, then returned home and checked on her children. She locked the door to her house, then walked back up the stairs and saw Edgar's car crashed into a neighbor's home. [¶] Gloria heard Edgar yelling from inside the neighbor's house, shouting, "Kiki did it." "Kiki" was Aranda, and she remembered thinking, "How did Kiki do this? How? When? How?" [¶] After Aranda had been questioned by police, he told Gloria he had not shot Edgar.

### Aranda's Testimony

Aranda testified that he stayed back with Gloria to talk for a few minutes after Edgar left, until he heard pops that sounded like a gun, at which time he ran up the stairs toward the street. At the top of the stairs, he saw a reflection of brake lights on a retaining wall, and he ran the other way, toward his house. As he ran home, Palomino popped out of the bushes, and when Aranda asked Palomino what happened, Palomino said, "That fool tripped." Palomino followed Aranda home, where Palomino waited outside until Aranda brought him a phone to use. A few minutes later, Palomino's mother showed up to give him a ride.

Gloria called Aranda and said the police were at her house, requesting him to return, which he did. Aranda spoke with the police and followed them to the station, where he consented to a gun powder check on his hands. He did not mention Palomino or Samaniego being there. [¶] At his family's suggestion, Aranda left town four days later because he feared retaliation against him or his family if he remained in the neighborhood. He was concerned it looked like he had an altercation with Edgar, and in his neighborhood, people did not cooperate with police because it put them or their family in danger. He never moved back because he feared someone would try to kill him or his family. [¶] Aranda admitted he had participated in gang activity when he was younger, but he distanced himself from gang

activity before the shooting incident. [¶] He testified there was no discussion with Palomino or Samaniego about bringing a gun, and he did not know anyone had a gun. After the shooting, he did not ask Palomino what was meant by Palomino's statement "that fool tripped," and he did not want to know. He said Palomino never specifically told him what happened.

*Enrique Palomino's Testimony*

Palomino told the jury he had consumed three or four little drinks before Aranda picked him up. Aranda said he was going to argue with someone at Gloria's house. He did not say he wanted to beat up anybody or shoot anybody, and he did not tell Palomino to watch out for anybody. Palomino did not have a gun with him, and he did not ask Samaniego to join them; Samaniego just did. [¶] Once they arrived, the three of them exited Aranda's vehicle and walked up the street toward Gloria's house together. Aranda went down the stairs, and Palomino and Samaniego stayed behind. [¶] Palomino did not see anyone come up the stairs, but he saw a person get in a car, which drove to the corner, then U-turned in front of Palomino. The car was facing away from Palomino and Samaniego when it stopped. The person in the passenger seat exited the vehicle. He was big, and he was wearing a big jacket. He asked Palomino and Samaniego where they were from, which Palomino understood to mean the man was in a gang. Palomino thought the guy had a gun because he thought the person was in a gang, and the person made a motion like he was reaching for a gun. Palomino was about 10 feet away, and he responded by backing up. Palomino did not see Samaniego's gun, but he saw Samaniego shoot Edgar. Palomino ran to Aranda's house, going a different direction from Samaniego. [¶] He called his mom, and she picked him up at Aranda's house. Later, Palomino told Aranda that Samaniego had shot the guy. [¶] He explained that he did not tell police what happened because he had not done anything; he was just there. If he had told police that he saw Samaniego shoot Edgar, he and his family could get in trouble with people in the neighborhood. Palomino thought Samaniego was bald at the time of the shooting. He remembered that Samaniego had a tail, but he could not remember if Samaniego had one on the day of the shooting.

When police contacted Palomino in 2015, he did not tell them what happened because he feared someone would harm his family if he talked. After an attorney was appointed, he decided to make a deal with the prosecutor so that he would not have to serve a life sentence for first degree murder and could instead serve three years for accessory after the fact. He

3:23-cv-0188-JES-AHG

said he did not shoot either Edgar or Alex, but he may have told Aranda that he would take credit for it rather than expose himself and his family to the danger of testifying that Samaniego was the shooter. He also said that since agreeing to testify, he had received threats and feared for himself and his family. [¶] When questioned about his relationship with Samaniego, Palomino admitted they had gotten into some fights and had not been hanging out in the two years preceding trial, but he said he was not testifying because he was mad at Samaniego. [¶] Palomino also testified that he considered himself to be an alcoholic and a drug addict, and he admitted to four DUIs.

*Maria A.'s Testimony*

Palomino's mother, Maria A., testified that she was celebrating her birthday at a party at her home on the day of the shooting in 2001. Palomino appeared at her party later; she did not know where he was picked up from or who had given him a ride, but it was not her. [¶] Maria noticed that Palomino was very nervous. He told her about the shooting the next day. He identified Samaniego, or "Pelón" as the shooter. She felt fearful about testifying because she was one of Samaniego's neighbors and was afraid something might happen.

*The 2001 Investigation*

San Diego Police Department homicide detective Joseph Cristinziani met Aranda the night of the shooting. Aranda was cooperative; police had no reason to suspect he was involved in the shooting at the time. Cristinziani was satisfied that Aranda was telling him the truth based on information he had about the case at the time he interviewed Aranda. [¶] Cristinziani also met with Edgar in the hospital. Edgar said there were two suspects, but he did not identify Aranda as the person who shot him. When police showed Edgar a photo line-up, Edgar tentatively identified one person as the second person present at the shooting and another person as someone he thought could be the shooter, but he could not provide a positive identification. Neither Palomino's nor Samaniego's photos were included in the photo line-up. [¶] An evidence technician conducted a gunshot residue test. Evidence of gunshot residue or an inconclusive result would have meant Aranda's statement was inconsistent with the physical evidence.

Police shared the composite sketch with the media and offered it on Crime Stoppers, and there was a reenactment of the crime on Channel 8, but

there were no leads or tips from the media coverage. Cristinziani also explained that the public in that neighborhood would not be cooperative with police because it was a gang neighborhood and the unofficial rule was to not talk to the police. [¶] Manuel Garcia was a gang detective for the San Diego Police Department in 2001. In February 2001, he was on the streets looking for suspects that matched the descriptions of the shooting suspects. Garcia documented contacts on field interview slips. During a field interview, he took a photograph of Samaniego because Samaniego was hanging out with a group that was possibly tagging in the area. Samaniego did not claim a gang membership. [¶] Linda Tibbetts also worked in the gang unit in 2001. She was conducting a field interview of Fabian Martinez when she noted that Samaniego fit the description of one of the suspects involved in the shooting. She could not remember if she had given a copy of her field interview slip to the detectives in the case.

*The 2014-2015 Investigation*

In 2014, a confidential informant came forward with information on the 2001 shooting, stating that Palomino was present. Another confidential informant said Samaniego was involved in the case. [¶] After receiving the information, San Diego Police Department Detective Lori Adams reviewed the case file. She found a polaroid picture of Samaniego in the file, which possibly matched the description of the shooter. She reached out to the DMV for additional photos of Samaniego. She compared the composite photo to the other photographs she had, and she noted similarities between a 2011 photo and the composite of the shooter. In 2011, Samaniego had long, slicked-back hair, and he had similar facial features. He also had long, slicked-back, collar-length hair in his 2015 DMV photos. But in other DMV photos, Samaniego's hair was shaved.

Detective Adams testified that there was no DNA or other physical evidence of any potential suspects at the scene of the shooting. Although Aranda's younger brother was initially the focus of their investigation, when Edgar did not pick him out of the photo line-up, they moved on. Detective Adams also interviewed Edgar. Edgar described the shooter as having a tail in his hair, and he said it was not Aranda who had shot him. She reviewed the gunshot residue results and noted they showed a lack of gunshot residue on the swabs taken from Aranda, indicating there was no gun powder residue on Aranda's hands.

When Detective Adams interviewed Palomino at his probation officer's office, Palomino said he was not at the shooting and knew nothing about it. After being questioned, he removed his GPS monitors and failed to return to his sober living program, which led Detective Adams to believe she had hit a nerve. [¶] Palomino was in custody on another case in October 2015 when police arrested him in the shooting of Alex and Edgar. Samaniego was arrested the same month. Aranda was arrested in November. [¶] At one point, Aranda and Samaniego were placed in the same holding cell, and Samaniego asked Aranda about the charges Aranda was facing. Samaniego said he knew police had at least one witness and maybe one or two more, and there were possibly others who would come forward, but Samaniego would deal with them in his own way. Aranda felt afraid. Later, a number of East Side gang members who shared Aranda's cell asked him a lot of questions about the case, which concerned Aranda.

After Palomino was arrested, law enforcement interviewed his mother. When police asked her to name someone involved, she told them, "I only heard that they would mention el pelón." She ultimately named Samaniego as the shooter. [¶] Detective Adams thought Palomino was involved, but because he did not match the description of the shooter, she did not think he was the shooter. Palomino had darker skin and was older than Edgar said the shooter was; the shooter was described as 15 to 16 years old, and Palomino was five years older than that. She also considered the information from the confidential sources along with the description Edgar provided, the location of where Palomino lived, and its proximity to the crime scene. [¶] Palomino's attorney offered information in exchange for a deal. During his "free talk" with the district attorney's office, Palomino told them that he was present to provide back up for Aranda in case Aranda got jumped, but it was clear no one was to get shot or killed, and no guns were involved. Palomino named Samaniego as the shooter.

San Diego District Attorney investigator Sandi Oplinger monitored jail calls and visits. She testified that she was concerned for Palomino's safety after listening to a discussion between Samaniego and his ex-girlfriend Jessica R., in which Samaniego asked Jessica to find out where Palomino was housed. [¶] In another conversation on a recorded line between Samaniego and Jessica while Samaniego was in custody, Jessica told Samaniego that her father would pay for his attorney if Samaniego could look at her father and tell him with 100 percent certainty that he did not shoot Alex and Edgar. He responded that the system was treating him

like he was guilty until proven innocent. When Jessica was asked if she understood his response to insinuate guilt, she replied, "Not at all."

*The Defense Case*

San Diego Police Officer Roel Tungcab testified that he spoke with a witness the night of the shooting who described the person running past him as five foot eight to five foot nine, with a military style haircut that was all one length. Isidro O., who was eight years old in 2001, testified that he heard loud noises, and when he looked out the window he saw a man running toward 60th Street. The man was wearing a striped shirt and had short hair that was all one length and was about five foot nine to five foot ten and white.

Araceli A., Samaniego's mother, testified that Samaniego had a shaved head in 2001, not long, collar-length, slicked-back hair. When he was around 15 years old, he had some hair on the back of his head, like a little tail, that was very thin and grew out of the middle of the back of his head. You could see the hair if it was pulled around the side of his head. [¶] When shown a picture of Samaniego from 2002, Araceli testified that the photo resembled him at that time, and she said he had a tail that was not visible in the photo. When shown a picture of Samaniego from 2004 in which the tail was visible, Araceli testified that his hair was the same there as she remembered it being in 2001. [¶] Araceli also testified that Samaniego and Palomino did not get along.

Arturo S., Samaniego's brother, testified that Samaniego was not in a gang and did not spend any time in juvenile hall in middle school or high school. He described Samaniego in 2001 as bald-headed with a ponytail, about five feet or five foot three, and smaller than five foot five. He said Samaniego's tail was long, probably to the middle of his back, and if you looked at Samaniego straight on, you could see the tail bouncing around, or if it came over his shoulder, it was visible. Otherwise, Samaniego kept his head shaved tight with a razor blade.

The defense also called John Wixted, a psychology professor at UCSD, as a memory expert. Wixted testified that eyewitness identification is unreliable if the witness is in contaminated conditions. The only uncontaminated memory test is the first time a witness's memory is tested, usually with a photo line-up. Witnesses who pick the defendant out of a photo line-up with six pictures including the suspect and five others with

similar physical features and say they are sure are "almost never wrong," but those who make in-court identifications are often wrong. [¶] Wixted also testified that composite sketches are unreliable because they will "look like a normal person" with the features of the suspect, but will not resemble the person in memory, and they contaminate the true memory. Further, when asked about an identification conducted by a person who had seen a photo line-up without the defendant included, helped developed a composite sketch of the perpetrator, and only saw the defendant for the first time in court, Wixted said the identification would be unreliable because the composite sketch would replace the memory of the perpetrator's identity.

*The Verdict and Sentencing*

The jury convicted Samaniego of murder of Alex with the intentional and personal discharge of a firearm in the commission or attempted commission of the murder (§§ 187, subd. (a), 12022.53, subd. (d)) and of the premeditated attempted murder of Edgar with the intentional and personal discharge of a firearm (§§ 187, subd. (a), 189, 664, 12022.53). [¶] In October 2019, the court sentenced Samaniego to 25 years to life on count 1, plus 25 years to life, consecutive, for the personal discharge of the firearm, for a maximum of 50 years to life. The court sentenced Samaniego to seven years to life for count 2 and added 25 years to life for the discharge of the firearm, to run concurrently, for a total sentence of 50 years to life. [¶] The court imposed a restitution fine pursuant to Penal Code section 1202.4, subdivision (b) for $10,000, and the additional restitution fine under Penal Code section 1202.45 for $10,000, stayed unless parole or supervision is revoked. It also ordered payment of a security fee under Penal Code section 1465.8 in the amount of $80, a criminal conviction assessment fee pursuant to Government Code section 70373 in the amount of $60, a criminal justice administration fee under former Government Code section 29550.1 in the amount of $154, and a general order of restitution to Edgar and to Alex's family under Penal Code section 1202.4, subdivision (f) to be determined later. The restitution pursuant to Penal Code section 1202.4, subdivision (f) to the victim compensation program was calculated to be a total of $43,625, subject to court modification.

ECF No. 14-46 at 4-18.

Petitioner appealed, raising eleven claims for relief (Claims 1 through 11 in the instant Petition). ECF No. 14-43. On October 19, 2021, the California Court of Appeal affirmed the judgment, denied each claim on the merits in a reasoned decision, and

additionally denied Petitioner's claim of prosecutorial misconduct (Claim 9 in the instant Petition) as forfeited because trial counsel failed to object at trial. ECF No. 14-46. Petitioner thereafter filed a petition for review in the California Supreme Court raising the same eleven claims. ECF No. 14-47. On January 19, 2022, the California Supreme Court denied the petition for review without a statement of reasoning or citation to authority, stating in full: "The petition for review is denied." ECF No. 14-48.

Petitioner thereafter filed a habeas petition in a different department of the state superior court than the trial court, which on March 16, 2022, that court denied as improperly raised on habeas review and forwarded the relevant materials to the trial court. *See* ECF No. 1-4 at 3-4. Petitioner thereafter filed a petition for resentencing in the trial court (the denial of which is at issue in Claim 12 in the instant Petition), which on August 3, 2022, after briefing and holding a prima facie hearing, the trial court denied in a reasoned decision. *See* ECF No. 1-5 at 15-18.

Petitioner thereafter filed an appeal in the California Court of Appeal, with counsel filing a brief stating there were no arguable issues. ECF No. 14-49. In an order issued on April 12, 2023, which followed Petitioner's failure to respond to the state appellate court's invitation and direction to file a supplemental brief or risk dismissal for abandoning the appeal, the California Court of Appeal dismissed the appeal. ECF No. 14-50.

On January 30, 2023, Petitioner filed the instant federal Petition, accompanied by several exhibits and a prayer for relief, the latter of which included several ancillary requests. ECF No. 1. On June 9, 2023, Respondent filed an Answer and lodged the state court record. ECF Nos. 13, 14. On July 14, 2023, and August 2, 2023, respectively, the assigned Magistrate Judge granted Petitioner's motions for an extension of time to file the Traverse (ECF No. 16) and for leave to file excess pages (ECF No. 18). *See* ECF Nos. 17, 19. On August 30, 2023, Petitioner filed a motion for the Court to rule on the Petition (ECF No. 20), which in an August 31, 2023, Order, the assigned Magistrate Judge

construed as (1) notice that Petitioner no longer intended to file a Traverse and (2) a request to rule on the Petition, and accordingly granted. ECF No. 21.

## II.    STANDARD OF REVIEW

A state prisoner is not entitled to federal habeas relief on a claim that the state court adjudicated on the merits, unless it: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Harrington v. Richter*, 562 U.S. 86, 97-98 (2011), quoting 28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id.*; *Bruce v. Terhune*, 376 F.3d 950, 953 (9th Cir. 2004). With respect to section 2254(d), "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable– a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007), citing *Williams*, 529 U.S. at 410. "State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Rice v. Collins*, 546 U.S. 333, 338-39 (2006), quoting 28 U.S.C. § 2254(e)(1).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101, quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "If this standard is difficult to meet, that is because it was meant to be.  As

amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. . . . It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Richter*, 562 U.S. at 102.

In a federal habeas action, "[t]he petitioner carries the burden of proof." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam). Still, "[p]risoner pro se pleadings are given the benefit of liberal construction." *Porter v. Ollison*, 620 F.3d 952, 958 (9th Cir. 2010), citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam).

## III.   PETITIONER'S CLAIMS

(1)    Trial court error in imposing fines and fees without first determining whether Petitioner had the ability to pay them violated his federal constitutional rights. ECF No. 1 at 6, ECF No. 1-3 at 18-20.

(2)    Trial court error in failing to instruct on voluntary manslaughter violated Petitioner's federal constitutional rights. ECF No. 1 at 7, ECF No. 1-3 at 21-27.

(3)    Trial court error in failing to hold a hearing on all of Petitioner's requests for substitution of counsel and by failing to appoint substitute counsel violated his federal constitutional rights. ECF No. 1 at 8, ECF No. 1-3 at 27-32.

(4)    Trial court error in excluding impeachment evidence as to witnesses Aranda and Palomino violated Petitioner's federal constitutional rights. ECF No. 1 at 9, ECF No. 1-3 at 33-34.

(5)    Trial court error in instructing the jury with CALCRIM 3471 and 3472 violated Petitioner's federal constitutional rights. ECF No. 1 at 13, ECF No. 1-3 at 34-39.

(6)    Trial court error in failing to instruct the jury on transferred self-defense violated Petitioner's federal constitutional rights. ECF No. 1 at 15, ECF No. 1-3 at 39-42.

(7)    Trial court error in failing to instruct the jury on adoptive admissions violated Petitioner's federal constitutional rights. ECF No. 1 at 17, ECF No. 1-3 at 42-44.

(8)     Trial court error in instructing the jury it could consider an eyewitness's certainty in evaluating the testimony of an eyewitness violated Petitioner's federal constitutional rights. ECF No. 1 at 19, ECF No. 1-3 at 44-46.

(9)     Prosecutorial misconduct during closing arguments violated Petitioner's federal constitutional rights. ECF No. 1 at 21, ECF No. 1-3 at 46-48.

(10)     Trial counsel rendered ineffective assistance in violation of Petitioner's federal constitutional rights. ECF No. 1 at 22, ECF No. 1-3 at 48-52.

(11)     The cumulative effect of errors rendered Petitioner's trial fundamentally unfair. ECF No. 1 at 23, ECF No. 1-3 at 52.

(12)     The trial court erred in denying Petitioner's request for resentencing in violation of his federal constitutional rights. ECF No. 1 at 24, ECF Nos. 1-4, 1-5.

## IV.   DISCUSSION

Respondent maintains federal habeas relief is unavailable as to all twelve of Petitioner's claims because (1) Claims 9 and 12 are procedurally barred and (2) the state court's rejection of Petitioner's claims was neither contrary to nor an unreasonable application of clearly established federal law. The Court will examine the asserted procedural bars as to Claims 9 and 12 in the discussion of those respective claims.

Petitioner raised Claims 1-11 in a petition for review filed in the California Supreme Court, which that court denied without a statement of reasoning or citation to authority. *See* ECF Nos. 14-47, 14-48. Petitioner previously presented those same claims to the California Court of Appeal on direct appeal, which that court denied in a reasoned opinion. *See* ECF Nos. 14-43, 14-46.

The Supreme Court has repeatedly stated a presumption exists "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, 584 U.S. ___, 138 S.Ct. 1188, 1193 (2018) ("We conclude that federal habeas law employs a 'look through' presumption.") Given the lack of any argument or grounds in the record to rebut this

presumption, the Court will "look through" the California Supreme Court's silent denial to the reasoned opinion issued by the state appellate court as to Claims 1-11. *See Ylst*, 501 U.S. at 804 ("The essence of unexplained orders is that they say nothing.  We think that a presumption which gives them *no* effect- which simply 'looks through' them to the last reasoned decision- most nearly reflects the role they are ordinarily intended to play.") (footnote omitted).

### A.    Claim 1- Imposition of Fines and Fees

Petitioner first asserts the trial court violated his federal constitutional rights by imposing fines and fees, including a $10,000 restitution fine that appears to comprise the bulk of the contested amount, without first determining whether Petitioner had the ability to pay them. ECF No. 1 at 6, ECF No. 1-3 at 18-20. The state appellate court rejected this claim and concluded Petitioner "forfeited any challenge to the assessments and fees for failure to object to their imposition at sentencing." ECF No. 14-46 at 79.

Challenges to the fact or duration of confinement are brought by petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, while challenges to conditions of confinement are brought pursuant to the Civil Rights Act, 42 U.S.C. § 1983. *See Preiser v. Rodriguez*, 411 U.S. 475, 488-500 (1973). When a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus. *Id.* at 500.

Moreover, "[s]ection 2254(a)'s language permitting a habeas petition to be entertained 'only on the ground that (the petitioner) is in custody *in violation of the Constitution or laws or treaties of the United States*,' (emphasis added), explicitly requires a nexus between the petitioner's claim and the unlawful nature of the custody." *Bailey v. Hill*, 599 F.3d 976, 980 (9th Cir. 2010), citing *Dickerson v. United States*, 530 U.S. 428, 439 n. 3 (2000). Accordingly, the Ninth Circuit has specifically held that "§ 2254(a) does not confer jurisdiction over a habeas corpus petition raising an in-custody challenge to a restitution order." *Id.* at 984; *see also Williamson v. Gregoire*, 151 F.3d

1180, 1183 (9th Cir. 1998) ("In general, courts hold that the imposition of a fine or the revocation of a license is merely a collateral consequence of conviction, and does not meet the 'in custody' requirement.") (collecting cases).

Here, even were Petitioner somehow able to obtain a new hearing or a potential reduction in fines and fees, it would not affect the fact or duration of his confinement and thus cannot state a cognizable claim for habeas relief. Thus, Claim 1 warrants denial for failure to state a cognizable claim on habeas review.

### B.    Claims 2 and 5-8 - Asserted Jury Instructional Errors

In Claims 2 and 5-8, Petitioner alleges the trial court violated his federal constitutional rights by committing various jury instructional errors. ECF No. 1 at 7, 13, 15, 17, 19, ECF No. 1-3 at 21-27, 34-46.

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986), quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984); *see also Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (same). To this end, "[i]t is well established that a criminal defendant is entitled to adequate instructions on the defense theory of the case." *Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 1999); *see also Mathews v. United States*, 485 U.S. 58, 63 (1988) ("As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."); *see also Beardslee v. Woodford*, 358 F.3d 560, 577 (9th Cir. 2004) ("Failure to instruct on the defense theory of the case is reversible error if the theory is legally sound and evidence in the case makes it applicable."), citing *United States v. Scott*, 789 F.2d 795 (9th Cir. 1986).

In evaluating a claim of instructional error, a reviewing court is required to determine "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire*, 502 U.S. 62, 72 (1991), quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the

17

context of the instructions as a whole and the trial record." *McGuire*, 502 U.S. at 72, quoting *Cupp*, 414 U.S. at 147. In situations where a claim involves an asserted failure to instruct rather than an erroneous instruction, a petitioner bears an "especially heavy burden" to show prejudice from the trial court's decision. *See Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) ("'An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law' and, thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an 'especially heavy burden.'"), quoting *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). Finally, even if federal constitutional error occurred, habeas relief is only available if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

### 1.    Claim 2- Failure to Instruct on Voluntary Manslaughter

Petitioner first contends the trial court violated his federal constitutional rights to present a defense, due process, a fair trial, and to a jury determination on every material issue by failing to instruct on voluntary manslaughter, and specifically that that the trial court erred in finding there was insufficient evidence to support imperfect self-defense and heat of passion voluntary manslaughter instructions because there was a lack of testimony that Petitioner believed he was in imminent danger or that the use of deadly force was necessary. ECF No. 1 at 7, ECF No. 1-3 at 21-27.

The Court looks to the decision of the state appellate court, which first acknowledged that "[a] court is obligated to instruct a jury on all theories of a defense supported by substantial evidence, including lesser-included offenses," and that the evidence, aside from speculation, is construed "in a light most favorable to a defendant" (ECF No. 14-46 at 35), and then rejected Petitioner's claim of error as follows:

B. Imperfect Self-Defense

Imperfect self-defense and heat of passion reduce an intentional, unlawful killing from murder to voluntary manslaughter. *Breverman*, *supra*, 19 Cal.4th at p. 154. The defense "applies where the defendant believes he

or she is facing an imminent and unlawful threat of death or great bodily injury, and believes the acts which cause the victim's death are necessary to avert the threat, but these beliefs are objectively unreasonable." *Curtis*, *supra*, 30 Cal.App.4th at p. 1354. However, imperfect self-defense cannot be used by a defendant whose wrongful conduct creates circumstances under which the victim's actions are legally justified. *In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.

As we previously explained, there is contradictory testimony about what occurred before the shooting began. Palomino testified that Edgar was in the vehicle and exited it to confront him and Samaniego, asking Palomino and Samaniego where they were from. He told the jury Edgar was wearing a big jacket. And he said that Edgar looked like he was reaching into a pocket, where he might have had a gun. But Palomino did not testify about any conversations he had with Samaniego in which they discussed the shooting. He did not provide any information about what Samaniego was actually thinking or whether Samaniego believed Edgar had or was reaching for a gun, or even whether Samaniego felt like his life was in danger. And although Palomino testified that he backed away from Edgar, that does not tell the jury what Samaniego, who had a gun and may have felt differently, thought or believed. [¶] Other testimony likewise does not shed light on whether Samaniego's actions were based on actual fear or the perceived need to act with deadly force. Aranda testified that immediately following the shooting, Palomino told him that "that fool tripped." And Edgar testified that Samaniego spoke to him first, saying "East side," which Edgar understood was a gang challenge or threat. When Edgar laughed and turned to Samaniego, Samaniego, who was five or six feet away, responded, "This is what's up," and already had a gun pointed at Edgar. Samaniego began firing shots at Edgar immediately, hitting Edgar in the chest before Edgar could get to the vehicle Alex was driving to dive through the window and escape. With no information about whether Samaniego actually believed he was facing an imminent and unlawful threat and whether he actually believed deadly force was necessary to protect himself, there was not substantial evidence to support the theory. *Curtis*, *supra*, 30 Cal.App.4th at p. 1354. Accordingly, the court properly declined to provide this instruction to the jury.

C. Heat of Passion

Murder can be reduced to voluntary manslaughter if the defendant acted in a heat of passion. This requires the victim's conduct to be

"sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection"; as well as the defendant to kill while actually influenced by strong passion induced by the provocation. *Enraca*, *supra*, 53 Cal.4th at p. 759. The provocation can be verbal, so long as it is "'such that an average, sober person would be so inflamed that he or she would lose reason and judgment.'" *People v. Manriquez* (2005) 37 Cal.4th 547, 585-586 (*Manriquez*). In addition to this objective component, the defendant must also actually and subjectively kill under a heat of passion. *People v. Steele* (2002) 27 Cal.4th 1230, 1252.

Samaniego argues that the same evidence supporting his claim for imperfect self-defense supports a heat of passion instruction, that a reasonable juror could have believed Edgar taunted Samaniego and acted aggressively, that Edgar's conduct actually angered Samaniego, that an ordinary person would have reacted with passion, and that Samaniego reacted from passion. [¶] He takes the position that he merely needs to show that he felt any "'"[v]iolent, intense, high-wrought or enthusiastic emotion.'"'" *Breverman*, *supra*, 19 Cal.4th at p. 163. And he cites to *People v. McCowan* (1986) 182 Cal.App.3d 1,15, a case in which the defendant "became enraged" when his ex-wife made an obscene gesture as he drove by, and that prompted him to shoot her. But McCowan is not helpful to Samaniego because there is not substantial evidence that either an ordinary, reasonable person would have become impassioned in this situation or that Samaniego actually was.

Assuming the events occurred as Palomino described in his testimony, that the vehicle U-turned in the street in front of him and Samaniego and Edgar stepped out of the vehicle "saying stuff," that does not explain why that would create a violent or intense response from the ordinary, reasonable person. See *Manriquez*, *supra*, 37 Cal.4th at pp. 585-586 (reasonable people do not become homicidally enraged by verbal taunts, profanities, and challenges); *People v. Avila* (2009) 46 Cal.4th 680, 706-707 (*Avila*); *Enraca*, *supra*, 53 Cal.4th at p. 759 (insults and gang-related challenges induce insufficient provocation to require heat of passion instruction). There is no evidence that Palomino himself felt such intense emotions, or that he lost all reason and judgment; in fact, he testified he backed away. [¶] There is also no testimony that shows Samaniego felt any intense emotion inducing him to react in a violent or passionate manner. *Mendoza*, *supra*, 24 Cal.4th at p. 174 (speculation does not warrant instruction). Even taking into consideration that an obscene gesture or

20

taunting words could induce such rage to warrant this instruction, there is scant evidence that Edgar did either of these things.

       D. Harmless Error

      Finally, even were the omission of these instructions erroneous, any error would be harmless. Given the evidence before the jury, there is no reasonable probability Samaniego would have received a more favorable verdict had the court instructed the jury on voluntary manslaughter. *Watson*, *supra*, 46 Cal.2d at pp. 836-837. The jury convicted Samaniego of premeditated and deliberate attempted murder and murder, thereby implicitly rejecting any version of events that indicated heat of passion or any sudden response to the situation. *People v. Wharton* (1991) 53 Cal.3d 522, 572 (*Wharton*) (premeditation and deliberation finding "manifestly inconsistent with having acted under heat of passion").

ECF No. 14-46 at 36-39.

When the defense requested an imperfect self-defense instruction, the trial court stated such instruction required "substantial evidence that the defendant feared imminent harm" and pointed out: "I haven't seen any of that." Reporter's Transcript ("RT") 2071, ECF No. 14-15 at 171. After the trial court indicated it would re-read relevant case law (*see id.*), the trial court and counsel discussed the matter again. RT 2224-27. Defense counsel pointed to Palomino's testimony and asserted that "you have a car that makes a U-turn in a dark area, it's a gang neighborhood, you have an individual getting out who is large, aggressive, wearing baggy clothes and looking like he has a weapon." RT 2224. The trial court again noted the need for "substantial evidence," including the defendant's "actual" belief in imminent harm and stated: "I have not seen any victim aggression that was unlawful" and "I don't have any testimony of accused beliefs." RT 2226. The trial court concluded: "I'm at the point where I have not had sufficient testimony for substantial evidence, and I did mention it yesterday and today. So that will be my ruling. I am not giving those." RT 2226-27. Immediately prior to the jury's verdict, the defendant inquired why there was no instruction on involuntary and voluntary manslaughter, to which the trial court explained: "Okay. Both voluntary and involuntary

manslaughter require evidence of your mindset, and that was a discussion we had whether you would take the stand. And I stated it that there was no evidence. I'm not trying the case for you. And that's why I did not give it. It wasn't there on the evidence, okay?" RT 2504.

Petitioner cites Palomino's testimony as "alone" providing substantial evidence to support an imperfect self-defense instruction, noting Palomino testified that the car made a U-turn, that Edgar, who was older and larger sized, emerged and acted aggressively, that it was unknown whether Alex was armed given he stayed in the car, and the incident took place in a gang neighborhood, and it was dark outside. ECF No. 1-3 at 22. However, as the state court correctly observed, there was contradictory testimony by Edgar that Petitioner spoke first, Edgar then turned around, and almost immediately thereafter Petitioner pulled out a gun. RT 1333-35. But even putting aside Edgar's differing account of events, Palomino's testimony fails to offer evidence of any requisite unlawful conduct by Edgar, nor does any evidence indicate that Petitioner, who again, was armed, had any imminent fear of harm. As such, the state court reasonably found that: "With no information about whether Samaniego actually believed he was facing an imminent and unlawful threat and whether he actually believed deadly force was necessary to protect himself, there was not substantial evidence to support the theory." ECF No. 14-46 at 37.

Petitioner similarly fails to offer any evidence that would have reasonably supported instruction on heat of passion. Again, even putting aside Edgar's account, Palomino testified Edgar emerged from the car after it made a U-turn and "started saying stuff," such as "Where are you guys from." RT 1785-86. But Palomino's account does not explain why a reasonable person would have become enraged from Edgar's statements, and Palomino did not indicate Petitioner had any such emotional reaction, as Palomino stated only that Petitioner and Edgar "were just arguing" before Petitioner started shooting. RT 1786. As the state court correctly observed, Palomino indicated that he chose to retreat from the situation. ECF No. 14-46 at 38; *see also* RT 1788. Given the lack of evidence of any emotional reaction by Petitioner, the state court reasonably found

that "there is not substantial evidence that either an ordinary, reasonable person would have become impassioned in this situation or that Samaniego actually was." ECF No. 14-46 at 38.

The jurors were also properly instructed that the prosecution bore the burden of proof, on Petitioner's presumption of innocence and on reasonable doubt *see* RT 2232, 2244-45, and that "the People must prove not only that Mr. Samaniego did the act charged, but also that he acted with a particular intent or mental state." RT 2235. The jurors were also thoroughly instructed on the elements of murder, including that the prosecution was required to prove that Petitioner committed murder with malice aforethought to find him guilty of first-degree or second-degree murder (*see* RT 2246-47; *see also* RT 2305-06), including that Petitioner "is guilty of first degree murder if the People have proved that he acted willfully, deliberately and with premeditation" and that "[i]f the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder." RT 2247-48; *see also* RT 2307. The jury was also instructed on the intent required for attempted murder and "the additional allegation that the attempted murder was done willfully and with deliberation and premeditation," similarly instructing the jurors that: "The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find this allegation has not been proved." RT 2249-50; *see also* RT 2308-09. The jurors were additionally instructed on self-defense, that Petitioner was "not guilty of murder or attempted murder if he was justified in killing or attempting to kill someone in self-defense or defense of another" and that again: "The People have the burden of proving beyond a reasonable doubt that the attempted killing and killing was not justified. If the People have not met this burden, you must find Mr. Samaniego not guilty of murder or attempted murder." RT 2250-51; *see also* RT 2309-10. The trial court also instructed that: "If you conclude that Mr. Samaniego committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder." RT 2252; *see also* RT 2311.

1    Here, given the lack of any evidence as to any fear or heightened emotions from

2 Petitioner arising from the events in question or any evidence that Edgar acted

3 unlawfully, Petitioner fails to show the state court unreasonably rejected his claim of

4 error based on the trial court's refusal to instruct the jurors on imperfect self-defense or

5 heat of passion. *See Mathews*, 485 U.S. at 63 ("As a general proposition a defendant is

6 entitled to an instruction as to any recognized defense for which there exists evidence

7 sufficient for a reasonable jury to find in his favor."); *see also Beardslee*, 358 F.3d at 577.

8 In any event, because the jurors were correctly instructed on the burden of proof,

9 reasonable doubt, and on the elements of the charged crimes, Petitioner fails to satisfy the

10 "especially heavy burden" of demonstrating that the failure to give the requested

11 instructions "so infected the entire trial that the resulting conviction violates due

12 process." *See Villafuerte*, 111 F.3d at 624, quoting *Kibbe*, 431 U.S. at 155; *see McGuire*,

13 502 U.S. at 72, quoting *Cupp*, 414 U.S. at 147. Because Petitioner fails to show the state

14 court decision was either contrary to, or an unreasonable application of, clearly

15 established federal law or that it was based on an unreasonable factual determination,

16 Claim 2 does not merit federal habeas relief.

17              **2.    Claim 5- Instructing with CALCRIM 3471 and 3472**

18    Petitioner next asserts the trial court violated his federal constitutional rights to due

19 process and to present a defense by instructing the jury with CALCRIM 3471 and 3472

20 and failing to instruct that the jurors could consider Edgar's prior behavior in evaluating

21 whether Petitioner acted in self-defense. ECF No. 1 at 13, ECF No. 1-3 at 34-39.

22    The state appellate court concluded that instructing the jury with CALCRIM 3471

23 was harmless error, as follows:

24         The court instructed the jury with CALCRIM No. 3471, a self-defense
          mutual combat instruction that explains that a person who engages in mutual
25         combat or starts a fight only has a claim to self-defense if he actually and in
          good faith tried to stop fighting, indicated that he wanted to stop fighting and
26         that he had stopped fighting, and gave the opponent a chance to stop
27         fighting.

28

1

2

3

4

5

6

7

      Samaniego argues that this instruction was irrelevant because mutual combat only applies in situations in which the defendant engages in physical combat. See, e.g., *Ross*, *supra*, 155 Cal.App.4th at pp. 1043-1044, 1051-1052 (describing combat as fighting by swords, via fisticuffs, using switchblades, or facing off with guns). Samaniego maintains that at most he verbally confronted Edgar, and there was no evidence of any physical altercation before the gunshots were fired. [¶] The People concede that this instruction was inapplicable because words alone do not constitute "start(ing) a fight," as that phrase is used in CALCRIM No. 3471. Accordingly, this instruction should not have been given.

8

9

10

11

12

      However, Samaniego did not suffer prejudice as a result. There is no indication the jury applied this instruction to the facts before it. The prosecution did not argue mutual combat prevented Samaniego from claiming self-defense, and there was no evidence of a physical altercation, so there is no reason that the omission of this instruction would have changed the outcome of the case.

13

14

15

16

17

      Further, Samaniego does not claim there were problems with the self-defense instruction, and nothing indicates the jury rejected the self-defense theory solely because it believed Samaniego had started a physical altercation with Edgar before shooting Edgar. See *Guiton*, *supra*, 4 Cal.4th at p. 1129. Indeed, here the jury rejected any claim of self-defense by concluding that Samaniego had attempted to murder Edgar with premeditation.

18

19

ECF No. 14-46 at 26-27. The state appellate court also found that instructing the jury with CALCRIM 3472 was not erroneous, as follows:

20

21

22

23

24

25

      Samaniego next claims that the jury was improperly instructed with CALCRIM No. 3472 because it was both legally incorrect and inapplicable. He argues CALCRIM No. 3472 should have been modified because there was evidence that Samaniego intended to provoke only a non-deadly confrontation to which Edgar responded aggressively in a manner that Samaniego interpreted to be deadly force, justifying his response with deadly force. Samaniego also contends that if he instigated any confrontation, it was merely verbal, making the instruction inapplicable.

26

27

28

      Samaniego's claim that CALCRIM No. 3472 is legally incorrect is without merit. CALCRIM No. 3472 explains that a defendant cannot claim self-defense if his wrongful conduct creates circumstances that justify the

adversary's attack. *People v. Enraca* (2012) 53 Cal.4th 735, 761 (*Enraca*); CALCRIM No. 3472. In *Enraca*, our Supreme Court held that the predecessor instruction, CALJIC No. 5.55, which was materially the same as CALCRIM No. 3472, was a correct statement of law. (footnote: We recognize that CALCRIM No. 3472 "might require modification in the rare case in which a defendant intended to provoke only a nondeadly confrontation and the victim responds with deadly force." *People v. Eulian* (2016) 247 Cal.App.4th 1324, 1334. As we explain, the facts here do not create such a situation because of contradictory testimony.) *Enraca*, at p. 761.

Although the court used the language of "physical attack" as an example of a defendant's wrongful conduct in *Enraca*, at least one appellate court has concluded CALCRIM No. 3472 is appropriate when a preliminarily verbal confrontation escalates into a physical one. In *Eulian*, *supra*, 247 Cal.App.4th at pages 1327-1328, the victim began shouting as she stepped out of her vehicle. The defendant approached her quickly, pointing and yelling at her, poking his finger close to her face. The victim threw cat kibble toward the defendant, and she raised her leg in a manner that looked like she may have kicked or pushed the defendant with her leg. The defendant's mother pulled him away by his arm; when he moved back toward the victim, the victim slapped him. The defendant punched the victim twice, then pulled her from her car and hit her two more times, after which she fell unconscious for a couple minutes. When she awoke, the defendant helped her to her feet and assisted her into her vehicle. [¶] The appellate court concluded there was a factual predicate for the use of CALCRIM No. 3472 because the jury could have concluded that the defendant provoked the conflict and continued to be the aggressor until the victim responded, at which point the defendant punched her and knocked her out. *Eulian*, *supra*, 247 Cal.App.4th at p. 1334. Under this interpretation, the defendant was the aggressor by screaming and jabbing his finger toward the victim's face, continuing to argue with her until his mother pulled him away. The court explained that if the victim kicked the defendant before he punched her, the jury could have concluded that the victim did so in response to aggressive conduct. Thus, the defendant did not have the right to use force to settle a physical confrontation that he created. *Ibid.*

The defendant in *Eulian* was charged with assault, not attempted murder or murder, but the facts share some similarities. Edgar testified that one of the people who confronted him spoke first, saying, "East Side Rascals," which he understood to be a verbal threat or a gang challenge.

Then, when Edgar turned back to them after passing by, he heard the shooter say, "This is what's up," and the gun was already pulled out. If the jury believed Edgar's testimony, it was Samaniego who instigated the confrontation. Under this view of the events, Samaniego's initial interaction was aggressive in its use of reference to gang membership and its implied threat. As the first to threaten, he was the first aggressor. And his use of the weapon almost immediately after confronting Edgar suggests he was prepared to use the weapon to engage in deadly force from the outset. Under this version of events, Samaniego's conduct disqualified him from claiming self-defense.

Palomino testified that Edgar, a big guy wearing a big jacket, exited the vehicle and "started saying stuff," asking where Palomino and Samaniego were from. Palomino thought this meant Edgar was in a gang. Then Edgar began arguing with Samaniego, and Samaniego began shooting. Palomino thought Edgar was acting like he had or may have been reaching for a gun. Under this recitation of the events, the initial aggressor was Edgar, because he got out of the vehicle and confronted Samaniego and Palomino. If the jury believed this version of the events, CALCRIM No. 3472 was irrelevant because Samaniego did not instigate a fight. But because there was a conflict in the facts, it was for the jury to determine whether Samaniego could properly claim self-defense in this case, and we cannot conclude the use of CALCRIM No. 3472 required any modification.

Samaniego separately argues the instruction was incorrect, relying on *People v. Ramirez* (2015) 233 Cal.App.4th 940, which rejected the use of CALCRIM No. 3472 under the circumstances of that case. There, the instruction was inappropriate because it did not allow for the intent to use nondeadly force before the adversary's sudden escalation to deadly force required a deadly response. *Ramirez*, at pp. 946-947. In such a circumstance, the defendant's wrongful conduct does not preclude a self-defense claim because the defendant's actions are not intended to create an excuse for deadly force; the deadly force comes in response to the victim's sudden escalation. [¶] But Samaniego's situation is not like Ramirez's because there was evidence before the jury that Samaniego instigated the confrontation, brought a weapon, and almost immediately wielded the firearm and began shooting.

Finally, even if the instruction should not have been given because it was irrelevant, Samaniego did not suffer prejudice as a result. As we explained *ante*, we presume the jury followed the instructions, and if there

1
2

were no instigation of a fight—contrived or otherwise—to justify offering CALCRIM No. 3472, the jury would have disregarded it as inapplicable under these facts.

3
4
5
6

*Id.* at 14-46 at 27-31. Finally, the state court found no error in failing to instruct the jury that it could consider whether Edgar's prior behavior in evaluating whether Petitioner's response to the situation was justified, reasoning in relevant part as follows:

7
8
9
10
11
12
13
14
15
16

Although Samaniego is correct that evidence of a threat by the victim against the defendant is admissible, there was no such evidence in this case. First, it is not clear that the incident Samaniego references on appeal can even be characterized as a threat. In the days before the shooting, Edgar and Aranda ran into each other in front of Aranda's grandmother's house when Edgar stepped out of his vehicle and Gloria pulled him back inside. Aranda testified that Edgar said, "What's going on?" It is not clear why this interaction constituted a threat at all. Further, although Aranda testified that he did not want to get jumped by Edgar and anyone else with him the night of the shooting, he did not testify that his fear was the result of any prior threat Edgar made. In fact, when asked if he had a reason to believe that Edgar might jump him, he said "[t]here was a possibility. I didn't know the situation." But he did not reference any prior interaction to justify this concern.

17
18
19
20

Second, there is no evidence that Samaniego was even aware of this prior interaction between Edgar and Aranda. Samaniego did not testify, and Palomino only testified that Aranda had told him that he was concerned about getting jumped by "some guys" and that he was going to argue with his ex-girlfriend's boyfriend. But there was no testimony that Edgar had conveyed any specific threat to Palomino or Samaniego.

21
22
23
24
25

Finally, even had Aranda perceived the earlier interaction as a threat, there is no evidence there was a threat to Samaniego. And Samaniego does not explain why a threat to a third party means he is entitled to the instruction. Thus, the failure to provide instruction that a prior threat by Edgar against Aranda may have justified a quicker or more harsh response by Samaniego was not error.

26

*Id.* at 31-32.

27
28

With respect to CALCRIM 3471, Petitioner alleges that the state court erred in finding he was not prejudiced by the erroneous instruction because the prosecutor used the instruction to argue he "was not entitled to a self-defense claim because he did not comply with the instruction's requirement to 'stop things.'" (ECF No. 1-3 at 34, quoting RT 2354-55.) A review of the record reflects that, contrary to the state court's determination, the prosecutor did in fact argue that Petitioner was not entitled to self-defense and referenced mutual combat in so contending, but the prosecutor primarily argued self-defense was not available because Petitioner brought a gun to the scene to "back up" Aranda and to get into an altercation in a "contrived" situation and "with the intent to create an excuse to use force." *See* RT 2354-55.

Even given this reference and argument, it is apparent from the testimony of both Edgar and Palomino that there was at most a verbal rather than a physical confrontation prior to Petitioner starting to shoot (*see* RT 1333-35, 1785-86), and CALCRIM 3471 did not apply to the situation presented. However, the trial court also specifically instructed the jurors that not all given instructions might apply to the case at hand and it was their duty to first determine the facts and then apply the relevant instructions. *See* RT 2230-31 ("And, now, some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them.") The jurors were also instructed that counsel's arguments and statements were not evidence. *See e.g.* RT 2233 ("Nothing the attorneys say is evidence.") A jury is presumed to understand and follow the trial court's instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 211 (1989). Finally, the defense argued reasonable doubt, not self-defense, contending Palomino and Aranda had been untruthful in implicating Petitioner and asserting that Petitioner had been misidentified and had not even been present at the scene. *See e.g.* RT 2374 ("Ladies and gentlemen, [Petitioner] was not at the scene. There's no evidence there. . . . There is not a single shred of physical evidence pointing to

1   [Petitioner] being at the scene. No DNA. No blood. No fingerprints. Hair follicles.

2   Something. Something other than the words of two liars."); *see also* RT 2375 ("Aranda

3   and Palomino are not credible. We've established that. Eyewitness identifications are

4   unreliable. They are heart-wrenching, but they are unreliable. The composite sketches are

5   unreliable.")

6        Evaluating this claim, as the Court must, "in the context of the instructions as a

7   whole and the trial record," *McGuire*, 502 U.S. at 72, and given the lack of testimony that

8   there was a physical altercation, the trial court's specific instruction to the jury to apply

9   only relevant instructions and that the arguments of counsel were not evidence, and the

10  defense's clear reliance on reasonable doubt rather than self-defense, Petitioner fails to

11  demonstrate the inclusion of CALCRIM 3471 "'by itself so infected the entire trial that

12  the resulting conviction violates due process.'" *Id.*, quoting *Cupp*, 414 U.S. at 147.

13  Petitioner also fails to show that any alleged error had a "substantial and injurious effect

14  or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

15       With respect to CALCRIM 3472, Petitioner asserts the instruction was erroneous

16  because his conduct "did not cause him to lose the right to defend himself" and "should

17  have at least been modified" given the evidence that he intended to provoke only a non-

18  deadly confrontation, but that Edgar responded aggressively "with what Samaniego

19  believed could have been deadly force." ECF No. 1-3 at 35. But this argument is based

20  solely on Palomino's account, and as the state court correctly and reasonably observed,

21  Edgar gave a conflicting account. While Palomino indicated that "the initial aggressor

22  was Edgar, because he got out of the vehicle and confronted Samaniego and Palomino,"

23  Edgar indicated "it was Samaniego who instigated the confrontation." *See* ECF No. 14-46

24  at 29-30; *see* also RT 1333-35, 1785-86. As such, the state court was not unreasonable in

25  concluding that "because there was a conflict in the facts, it was for the jury to determine

26  whether Samaniego could properly claim self-defense in this case" (ECF No. 14-46 at

27  30), and to decide whether the unmodified version of CALCRIM 3472 applied.  Again,

28

the jury was directed that not all instructions might apply to the case, and they were to apply the relevant instructions after they first found the facts. *See* RT 2230-31.

Based on a review of the trial record and the jury instructions considered as a whole, the Court cannot conclude the unmodified version of CALCRIM 3472 "'by itself so infected the entire trial that the resulting conviction violates due process.'" *McGuire*, 502 U.S. at 72, quoting *Cupp*, 414 U.S. at 147. Petitioner not only fails to show that the trial court erred in instructing the jury with CALCRIM 3472, but also fails to demonstrate that any alleged error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

Finally, with respect to Petitioner's assertion that the jury should have been instructed it could consider Edgar's prior threatening conduct in evaluating whether Petitioner may have acted reasonably under the circumstances (*see* ECF No. 1-3 at 36), it is apparent the state court correctly found there was minimal evidence of prior threatening behavior and in any event, found no record evidence *Petitioner* was aware of any prior threatening conduct. *See* ECF No. 14-46 at 31-32. While Petitioner asserts that "[a] reasonable juror could have found Aranda told Samaniego about the incidents since they were the reason why Aranda sought Samaniego's assistance" (*see* ECF No. 1-3 at 36), there was no evidence Aranda relayed any such threats to Samaniego or Palomino when he asked for their assistance. Instead, Aranda testified only that he asked Palomino "to see if they'd come with me and get my back" (*see* RT 1643), and said he wanted the back up "[j]ust in case I got jumped. Just in case there was more than one guy out there. I didn't want to get jumped." RT 1644-45. Aranda also said he only discussed with Palomino what he wanted them for, again stated he "[j]ust talked to him about, you know, just in case there's any trouble just get my back. Make sure I don't get jumped," and did not recall whether Petitioner was in the car at that time. RT 1647-48. Palomino simply testified that Aranda asked for company "to see if something happens or something." RT 1780.

Given the lack of any actual record evidence that Petitioner was aware of any prior history between Aranda and Edgar, much less any prior threats by Edgar, the state court was reasonable in concluding that "the failure to provide instruction that a prior threat by Edgar against Aranda may have justified a quicker or more harsh response by Samaniego was not error." ECF No. 14-46 at 32. Given there appears no basis in the record for such instruction, Petitioner clearly fails to satisfy the "especially heavy burden" of demonstrating that the failure to give this requested instruction "so infected the entire trial that the resulting conviction violates due process." *See Villafuerte*, 111 F.3d at 624; *see McGuire*, 502 U.S. at 72.

Because Petitioner fails to show the state court decision was either contrary to, or an unreasonable application of, clearly established federal law or that it was based on an unreasonable factual determination, Claim 5 does not merit federal habeas relief.

### 3.    Claim 6- Failure to Instruct on Transferred Self-Defense

In this claim, Petitioner contends the trial court violated his federal constitutional right to due process, to a jury trial, and to present a defense by failing to instruct the jury on transferred self-defense. ECF No. 1 at 15, ECF No. 1-3 at 39-42.

The state appellate court rejected this claim in a reasoned decision as follows:

A court has a sua sponte duty to instruct on all theories of a defense when there is substantial support in the evidence for it. *People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*). This duty arises when it appears a defendant is relying on the defense or when there is substantial evidence to support the defense and the defense is not inconsistent with the defendant's theory of the case. *Id.* at p. 157. However, "(a) trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel." *People v. Lee* (2011) 51 Cal.4th 620, 638 (*Lee*). The issue here is whether transferred intent constitutes a defense to which this rule applies and if so whether the lack of such an instruction prejudiced Samaniego. [¶] "Traditional self-defense applies where the defendant believes he or she is facing an imminent and unlawful threat of death or great bodily injury, and believes the acts which cause the victim's death are necessary to avert the threat, and these beliefs are objectively reasonable." *People v. Curtis* (1994) 30 Cal.App.4th 1337, 1357 (*Curtis*). This defense is available to a defendant who intends to kill or injure a person posing a threat

but instead injures or kills a third party under the doctrine of transferred intent. *Ibid*; *People v. Mathews* (1979) 91 Cal.App.3d 1018, 1024. Transferred intent can be used by a defendant because the lack of criminal intent follows the act to its consequences. *People v. Levitt* (1984) 156 Cal.App.3d 500, 507-508 (*Levitt*).

Although self-defense negates the malice aforethought requirement for murder, transferred intent is not a separate defense with a separate instruction. It is an extension of self-defense. The court had no sua sponte duty to provide a pinpoint instruction, and Samaniego did not request an instruction for transferred intent. See *Lee*, *supra*, 51 Cal.4th at p. 638; see also *Levitt*, *supra*, 156 Cal.App.3d at pp. 507-508 (transferred intent instructions must be given upon request). [¶] Even had the court erred in failing to provide an instruction for transferred intent, the failure to do so would be "an error of California law alone" at most, "subject . . . , to the *Watson* standard of reversal." *Breverman*, *supra*, 19 Cal.4th at pp. 165, 169, 171, 174.

It is not probable here that an error would have altered the outcome. The court instructed the jury with CALCRIM No. 505, which states that a "defendant is not guilty of murder or attempted murder if he was justified in killing or attempting to kill someone in self-defense or defense of another" as long as "(he) reasonably believed that he or someone else was in imminent danger of being killed or suffering great bodily injury," reasonably believed that the immediate use of deadly force was necessary, and only used the amount of force reasonably necessary to defend against the imminent danger. [¶] This was an appropriate instruction because the applicability of self-defense was a question of fact. If the jury believed Palomino's testimony that Edgar engaged him first and was reaching for a weapon when Samaniego fired the gun, Samaniego may have had a valid claim of self-defense. If he properly claimed self-defense as to Edgar, that defense would extend to the bullets that unintentionally hit Alex.

However, if the jury believed Edgar's testimony that Samaniego confronted him and began firing almost immediately, or Aranda's testimony that Palomino initially claimed that Samaniego accidentally fired the gun because "that fool tripped," Samaniego would have no self-defense claim to justify shooting Edgar, and the doctrine of transferred intent would be inapplicable. The jury convicted Samaniego of the premeditated attempted murder of Edgar, so it did not find that Samaniego acted in self-defense. Accordingly, it is not probable that the jury would have concluded a claim of

33

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

self-defense justified Alex's death because there was no conclusion that Samaniego acted in self-defense at all. *Watson*, *supra*, 46 Cal.2d at pp. 836-837.

ECF No. 14-46 at 32-35.

To the extent Petitioner contends the trial court erred in failing to give a pinpoint instruction on transferred self-defense, his claim is not cognizable on habeas review because the state court's ruling that the instruction was not required was based entirely on the interpretation and application of state law. *See McGuire*, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *see also Rhoades v. Henry*, 611 F.3d 1133, 1142 (9th Cir. 2010) ("[V]iolations of state law are not cognizable on federal habeas review.") This Court is bound by the state court decision that under state law the pinpoint instruction was not required unless it was requested by defense, which in this case it was not. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting the "[Supreme Court] ha[s] repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."), citing *McGuire*, 502 U.S. at 67-68; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).

Nor does Petitioner show that the absence of this instruction resulted in prejudice. As noted previously and as recognized by the state court (*see* ECF No. 14-46 at 33-34), the trial court instructed the jurors on self-defense, including that Petitioner was "not guilty of murder or attempted murder if he was justified in killing or attempting to kill someone in self-defense or defense of another," that Petitioner must have "reasonably believed" he or another was in imminent danger of death or great bodily harm, "reasonably believed" that the immediate use of force was necessary, and that Petitioner "used no more force than was reasonably necessary" in defense. RT 2250. The jury was also instructed that: "The People have the burden of proving beyond a reasonable doubt that the attempted killing and killing was not justified. If the People have not met this burden, you must find Mr. Samaniego not guilty of murder or attempted murder." RT

2251. The state court reasonably concluded that had the jury believed Palomino's account that Edgar instigated the encounter and was potentially reaching for a weapon, a claim of self-defense against Edgar "would extend to the bullets that unintentionally hit Alex," but that the jury necessarily rejected any claim of self-defense when they convicted Petitioner of premeditated attempted murder as to the shooting of Edgar, which also obviated any potential self-defense claim as to Alex's death. ECF No. 14-46 at 34-35.

Petitioner fails to show the state court acted unreasonably in rejecting his claim of error arising from the trial court's failure to sua sponte give a pinpoint transferred intent instruction when the instructions provided addressed any potential finding that Petitioner used reasonable force to defend himself against Edgar and because the jury in any event rejected self-defense in finding Petitioner guilty of premeditated attempted murder as to Edgar. *See Mathews*, 485 U.S. at 63 ("As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."); *see also Beardslee*, 358 F.3d at 577.

Because the jurors were correctly instructed on self-defense and clearly rejected any potential self-defense claim as to Edgar, Petitioner fails to satisfy the "especially heavy burden" of demonstrating that any failure to sua sponte instruct on transferred intent "so infected the entire trial that the resulting conviction violates due process." *See Villafuerte*, 111 F.3d at 624; *see McGuire*, 502 U.S. at 72. Petitioner fails to show the state court decision was either contrary to, or an unreasonable application of, clearly established federal law or that it was based on an unreasonable factual determination. Claim 6 does not merit federal habeas relief.

### 4. Claim 7- Failure to Instruct on Adoptive Admissions

Petitioner next asserts the trial court violated his federal constitutional right to a fair trial and improperly lessened the prosecution's burden of proof by failing to instruct the jury on adoptive admissions. ECF No. 1 at 17, ECF No. 1-3 at 42-44.

The state appellate court first discussed the relevant facts as follows:

The People moved in limine to offer statements Samaniego made to Jessica during a telephone call from jail. Jessica told Samaniego that her dad said if Samaniego could look at him and tell him 100 percent that Samaniego did not do it, her dad would pay for the lawyer. Samaniego replied, "Yeah, you know, but . . . even it's a yes or no, it's a lot of money. It's a lot of money, you know. I'm in here, you're . . . you know, you're guilty till proven innocent here. That's all it is. And, and it's not the first time I'll get through. It's the third time." When Jessica was asked if she understood his response to insinuate guilt, she replied, "Not at all." [¶] Before closing arguments but after the court had already instructed the jury, the People asked for adoptive admissions instruction, and the court said it did not disagree that it probably was arguably an adoptive admission, but they should have dealt with it the previous day. It was not going to re-read the instructions, but it would not prevent the prosecutor from arguing the statements were adoptive admissions. [¶] The People played a portion of the conversation between Samaniego and Jessica and argued the conversation showed consciousness of guilt because Samaniego did not say he was not the shooter. The defense told the jury that the conversation between Jessica and Samaniego was not an adoptive admission; she did not understand his comment to be an admission, and the jury should not either. [¶] The jury requested transcripts from these conversations with Jessica.

ECF No. 14-46 at 39-40. After then discussing the relevant legal principles, including that "[a]n adoptive admission occurs when the defendant participates in a private conversation in which the crime is discussed, and the defendant has an opportunity to deny responsibility but fails to do so," that under the California Evidence Code, "courts are *required* to so instruct only at a defendant's request" when there is substantial evidence to support it," and that "a trial court may give the adoptive admissions instruction, whether or not requested, if it believes the instruction will be helpful to the jury, and it may do so over the defendant's objections" (*id.* at 40-41) (citations omitted), the state court rejected the claim, reasoning as follows:

Although a court is required to give the adoptive admission instruction at a defendant's request, the law does not require it to do so upon request by the People. In those circumstances, the court *may* give the instruction if it believes doing so will help the jury. *Charles*, *supra*, 61 Cal.4th at p. 331; see Evid. Code, § 1221. Here, the instruction was not requested by Samaniego,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

so the court was not required to provide it. [¶] Samaniego argues this decision was erroneous because the prosecution argued the exchange was an adoptive admission, and the jury was unaware of the requirements for an adoptive admission. But Samaniego does not explain why the label of adoptive admission in the instant case affected the result. "The instruction is largely a matter of common sense--silence in the face of an accusation is meaningful, and hence may be considered, only when the defendant has heard and understood the accusation and had an opportunity to reply." *Carter*, *supra*, 30 Cal.4th at p. 1198. [¶] Here, with or without the instruction, the circumstances call into doubt the weight or significance of Samaniego's response to Jessica as an adoptive admission. The call took place while Samaniego was on a recorded jailhouse phone line, which Samaniego knew was being recorded. So, he may not have felt like he could speak freely. And his admission was neither a direct admission nor silence. He told Jessica that paying for an attorney was expensive. He believed the system already viewed him as guilty, so he was not sure the money would matter. Defense counsel argued the context of the exchange showed it did not indicate any consciousness of guilt -- and the person making the statement did not view Samaniego's response as demonstrating guilt. The jury had before it the information it needed to assess whether the exchange was evidence of guilt, so it is not evident that the instruction would have aided the jury in a meaningful way.

16

ECF No. 14-46 at 39-42.

17
18
19
20
21
22
23
24

To the extent Petitioner contends the trial court erred in failing to instruct on adoptive admissions, this claim is not cognizable on habeas review because the state court's ruling that the instruction was not required was based wholly on state law. *See McGuire*, 502 U.S. at 67-68; *see also Rhoades*, 611 F.3d at 1142. Again, this Court is bound by the state court's holding that under state law this instruction was not required unless the defense requested it and substantial evidence supported it and because only the prosecution requested instruction here, it was not required.[2] *See Richey*, 546 U.S. at 76

25
26
27
28

_____

[2] The record also reflects that the prosecution belatedly requested this instruction after the trial court had already provided the jurors with the bulk of their instructions. *See* RT 2303. Moreover, during an earlier conference on jury instructions (*see* RT 2053), which took place after Ramos had testified (*see* RT 1987), the trial court raised the matter of

(noting the "[Supreme Court] ha[s] repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."), citing *McGuire*, 502 U.S. at 67-68; *Mullaney*, 421 U.S. at 691.

In any event, Petitioner fails to demonstrate that the absence of this instruction improperly lessened the prosecution's burden of proof. Again, the jurors were properly instructed that the prosecution bore the burden of proof, as well as instructed on Petitioner's presumption of innocence and reasonable doubt. *See* RT 2232, 2244-45. While the prosecutor argued that Petitioner's conversation with Jessica Ramos was an adoptive admission, asserting that: "He is given an opportunity to say in a normal situation where somebody would say I did not do this" and: "He doesn't say it," which is "what is a guilty person says" (RT 2357-58), the defense reasonably countered this argument in its own closing by reminding the jurors that Ramos "didn't take it as any type of admission" and arguing to the jurors: "Neither should you." RT 2369. Moreover, as the state appellate court correctly and reasonably observed, the call took place on a known monitored and recorded jail phone line and Petitioner's response was "neither a direct admission nor silence," but he instead stated that paying for an attorney was expensive and that he felt the "system already viewed him as guilty, so he was not sure the money would matter." ECF No. 14-46 at 41-42.

Given the jury was well-aware of the circumstances under which the conversation occurred, the conversation itself was played for the jurors (*see* RT 1990), and considering the claimed error in the context of the whole trial record and the entirety of the jury instructions, Petitioner has not satisfied his "especially heavy burden" to demonstrate that the trial court's failure to instruct the jury on adoptive admissions in the absence of a

_____

instructing on adoptive admissions, opined that such an instruction "is out," and both attorneys agreed with the trial court's assessment. *See* RT 2059.

defense request "so infected the entire trial that the resulting conviction violates due process." *Villafuerte*, 111 F.3d at 624; *McGuire*, 502 U.S. at 72.

Petitioner thus fails to demonstrate the state court decision was either contrary to, or an unreasonable application of, clearly established federal law or that it was based on an unreasonable factual determination. Claim 7 does not merit federal habeas relief.

### 5.    Claim 8- Instruction on Evaluating Eyewitness Testimony

Petitioner next asserts the trial court violated his federal constitutional right to due process and lessened the prosecution's burden of proof when it instructed the jury it could consider an eyewitness's certainty in evaluating the testimony of an eyewitness. ECF No. 1 at 19, ECF No. 1-3 at 46-48.

The state appellate court first discussed the facts relevant to this claim, recounting:

> At trial, Edgar testified that he was positive Aranda did not shoot him, and he identified Samaniego as the shooter. The prosecutor asked Edgar what made him believe Samaniego was the shooter, and Edgar responded, "He aged a little bit, but he's the same guy. That's him. I remember him." [¶] The defense challenged Edgar's memory: "As you sit here today, I mean, it's been 18 years, right?" And Edgar replied, "I remember that face. When somebody has a gun in your face, yeah. Somebody is trying to kill you, yeah, I remember that face." Then defense counsel challenged Edgar's focus at the time of the shooting: "And the gun was in your face. Is it fair to say that your attention was drawn to the gun?" Edgar responded, "It was drawn to the shooter and the gun." Edgar testified on cross by defense counsel, "I remember who shot me, and he's sitting here." [¶] On redirect, the prosecutor asked: "You said that you definitely saw the defendant here, Mr. Samaniego, with a gun in his hand shooting you, correct?" Edgar replied, "Yes." The prosecutor queried, "And as you sit here today, there's no doubt in your mind that this defendant is the person that shot you and shot your friend in the car, Alex [ ]?" And Edgar answered, "Yes."

ECF No. 14-46 at 42-43. After noting that the trial court instructed the jury with CALCRIM No. 315, which included "a list of factors to consider in determining whether an eyewitness's identification is accurate," and the factor "How certain was the witness when he or she made an identification?", and with CALCRIM No. 332, which concerned the jury's consideration of the expert who testified "about memory and the accuracy of

identification" (*see id.* at 43), the state court addressed Petitioner's challenge to the use of CALCRIM No. 315, reasoning as follows:

> Samaniego challenges the trial court's use of CALCRIM No. 315, arguing his convictions should be reversed because Edgar's certainty during his in-court identification was crucial to a guilty verdict and was an improper factor for the jury to consider. We review challenges to jury instructions de novo. *People v. Posey* (2004) 32 Cal.4th 193, 218.

> Our Supreme Court recently addressed this issue in *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*). *Lemcke* held that listing the witness's level of certainty among the factors a jury considers under CALCRIM No. 315 to evaluate eyewitness identifications does not render a trial fundamentally unfair or otherwise amount to a due process violation. *Lemcke*, at pp. 647, 660-661. Nothing in the instruction operates "to 'lower the prosecution's burden of proof'" because "the instruction does not direct the jury that 'certainty equals accuracy.' (Citation.)" *Id.* at pp. 647, 657, 658. [¶] The defendant in *Lemcke* presented a rigorous identification defense, his counsel cross-examined investigating officers to explore problematic aspects of identification procedures, and he called an eyewitness expert who "testified at length about the weak correlation between certainty and accuracy, particularly with respect to in-court identifications." *Lemcke*, *supra*, 11 Cal.5th at p. 660. In the end, although the court acknowledged that "an enhanced or modified version of the certainty instruction might well be advisable," it explained that the inclusion of witness certainty as a factor for jurors to consider nonetheless did not establish a due process violation. *Id.* at p. 661.

> The case before us is comparable. Like the defendant in *Lemcke*, Samaniego presented a rigorous defense challenging his identification as the shooter, challenging the credibility of witnesses, and noting the lack of physical evidence connecting him to the scene. Samaniego offered expert testimony to challenge the accuracy of an in-court identification, the type he now contends was problematic. And his attorney questioned the credibility of various witnesses. Further, the jury was instructed that the People bore the burden of proving beyond reasonable doubt that it was the defendant who committed the crime (CALCRIM No. 315) and that it was required to consider the expert's testimony (CALCRIM No. 332). And the prosecutor reiterated the People's burden of proof in closing arguments. These actions helped ensure fairness. [¶] We recognize that the Supreme Court has directed trial courts to omit the certainty factor from CALCRIM No. 315

going forward, until the Judicial Council can consider how the language might be better worded to minimize any possible juror confusion on that point. *Lemcke*, *supra*, 11 Cal.5th at pp. 668-669. However, "nothing in CALCRIM No. 315's instruction on witness certainty operates to 'lower the prosecution's burden of proof.'" *Id.* at p. 657. It leaves it to the jury to decide the credibility of a witness's level of certainty and what weight to assign the certainty. *Ibid.* Additionally, nothing in CALCRIM No. 315 suggests to a jury that it should ignore expert testimony regarding witness certainty. *Id.* at p. 658. [¶] Here, like in *Lemcke*, other instructions undercut the claim that the certainty language lowers the burden of proof. *Lemcke*, *supra*, 11 Cal.5th at p. 658. The court instructed the jury that Samaniego was presumed innocent and that the prosecution bore the burden of proving the crimes beyond a reasonable doubt, and CALCRIM No. 315 states that the People bear the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. Under these facts, the reference to witness certainty was not error.

*Id.* at 44-45.

Petitioner fails to demonstrate that the inclusion of the witness certainty factor in CALCRIM 315 improperly lessened the prosecution's burden of proof or violated Petitioner's federal due process rights. As discussed previously, the jurors were properly instructed that the prosecution bore the burden of proof and were also thoroughly instructed on Petitioner's presumption of innocence and reasonable doubt. *See* RT 2232, 2244-45. Moreover, while the trial court's instructions to the jury on the evaluation of eyewitness testimony included numerous factors, certainty of the witness among them, the trial court also clearly and specifically reminded the jurors in that same instruction that: "The People have the burden of proving beyond a reasonable doubt that it was Mr. Samaniego who committed the crime. If the People have not met this burden, you must find Mr. Samaniego not guilty." RT 2239. The trial court also thoroughly instructed the jury on the evaluation of expert testimony, including the consideration of "the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion"

1   (RT 2240), which was relevant to their evaluation of the proffered defense eyewitness

2   identification expert.

3          Finally, as the state court correctly and reasonably recognized, Petitioner's defense

4   counsel "presented a rigorous defense challenging his identification as the shooter,"

5   including the previously noted expert testimony, the lack of physical evidence connecting

6   Petitioner to the crime scene and challenges to the credibility of witnesses. *See* ECF No.

7   14-46 at 44-45. Indeed, defense counsel again ably raised and emphasized each of these

8   points in closing, including repeatedly noting the differences between Petitioner's photo,

9   witness descriptions and the composite (*see* RT 2364, 2370-71, 2374), as well as Edgar's

10  in-court identification with reference to the expert's testimony that such in-court

11  identifications were unreliable. RT 2364 ("And when [Edgar] was on the stand, it was

12  powerful. He points at [Petitioner] and he says, 'That's the guy that shot me.' But we

13  know in-court identifications are unreliable. Dr. Wixted testified to that. How many times

14  has a rape victim, or a victim of some violent crime, pointed out to the person and said

15  'That's the person,' and they have been exonerated? Not because they're lying. They

16  truly believe that that is the person, but they are wrong.") Counsel also referenced the

17  expert's testimony that the best tool for identification was a six-pack lineup and

18  questioned the failure to use a six-pack lineup containing Petitioner's photo with Edgar.

19  *See* RT 2365. Counsel also discussed other aspects of the expert's testimony, including

20  that composites were a tool, but that other evidence was also important. *See* RT 2371.

21         Here, given the jurors were properly instructed on the burden of proof, Petitioner's

22  presumption of innocence, and reasonable doubt, and were specifically instructed on how

23  to evaluate the proffered expert testimony on eyewitnesses, and considering the

24  assertedly erroneous reference to witness certainty in the context not only of the witness

25  identification instruction as a whole, but in the context of the entire trial record and the

26  full complement of the provided jury instructions, Petitioner has not shown that the

27  claimed error "so infected the entire trial that the resulting conviction violates due

28  process." *McGuire*, 502 U.S. at 7.

1
2
3

Because Petitioner fails to show the state court decision was either contrary to, or an unreasonable application of, clearly established federal law or that it was based on an unreasonable factual determination, habeas relief is not warranted on Claim 8.

4

**C.    Claim 3- Failure to Hold Hearing and Denial of *Marsden* Requests**

5
6
7
8

Petitioner next asserts the trial court's failure to hold a hearing on every one of his requests for substitution of counsel and the repeated denial of his requests violated his federal constitutional rights to a fair trial, the effective assistance of counsel, due process, and his right to a fair juvenile transfer hearing. ECF No. 1 at 8, ECF No. 1-3 at 27-32.

9
10
11
12
13

The Court looks to the opinion of the state appellate court, which first outlined Petitioner's claim and the relevant legal principles and recounted the events of the numerous *Marsden* hearings the trial court held between June 8, 2016, and July 31, 2019, as well as the January 6, 2019, denial of a *Marsden* hearing (*see* ECF No. 14-46 at 54-70.)[3] The state appellate court then rejected Petitioner's claim, reasoning as follows:

14
15
16
17
18
19
20
21
22

> Samaniego contends the court erred in denying each of the *Marsden* motions because his attorney performed inadequately outside the courtroom and because his attorney failed to adequately prepare for trial and the juvenile court fitness hearing. He maintains that the record demonstrates his attorney failed to "investigate and present evidence that was significant to the key issues in his case and his fitness hearing." He further argues that he told the court he did not trust his counsel and that he "disagreed on defense strategy" because he wanted alternative defenses presented, not just a misidentification defense. And he contends that none of the *Marsden* hearings rectified his dissatisfaction or distrust over the lengthy period of the attorney client relationship; he never found his attorney's representation was effective.

23
24
25
26
27
28

[3] Respondent has lodged under seal transcripts from several of Petitioner's *Marsden* hearings, which the Court has reviewed. *See* ECF Nos. 26-27. Given those materials remain lodged under seal and the state appellate court's factual findings as to the content of the *Marsden* hearings as outlined in its opinion (*see* ECF No. 14-46 at 56-70), are presumptively correct and entitled to deference in these proceedings, *see Sumner*, 449 U.S. at 545-47, and because Petitioner does not in any event contest the correctness of those findings, the Court relies on and references the state court's account of Petitioner's *Marsden* hearings in the adjudication of this claim.

Samaniego must show that the court abused its discretion in denying his motions with evidence presented to the court to demonstrate that his attorney was not providing adequate representation or that he and defense counsel were embroiled in such an irreconcilable conflict that the result would be ineffective assistance. *People v. Jones* (2003) 29 Cal.4th 1229, 1244-1245. But Samaniego does not detail what specifically showed constitutionally inadequate representation by his attorney. His arguments on appeal highlight that the crux of his disagreement was over strategy, not due to any conflict of interest, and the evidence in the record shows that his distrust was not based in evidence, but only related to Samaniego's misperceptions about the defense counsel's access to evidence.

Samaniego told the court at each of the *Marsden* hearings that his attorney did not spend enough time with him. He said his attorney did not visit him frequently enough; when they visited, his attorney looked at his watch; his attorney took vacations without telling him; and once he complained that he did not have his attorney's direct phone number. Defense counsel reported meeting with Samaniego for at least an hour each time they met and sometimes closer to two or three hours, and his visits averaged about two hours in length. He acknowledged looking at his watch because he had other clients and work to conduct, and he told the court at least once that he could not see his client as frequently as he wanted. He was spending a significant amount of time on Samaniego's case and was not burdened by other cases, and he had provided Samaniego with a direct phone number. [¶] The court explained it was often in a defendant's best interest for the attorney to work in his office to put together the case. At one hearing, the court explicitly found that defense counsel had spent time with Samaniego and catered to some of Samaniego's requests, including efforts at transcribing audio recordings. The court implicitly determined that the amount of time counsel was spending with Samaniego was not inadequate. Further, the court explained that Samaniego had not stated sufficient grounds for a new attorney based on his subjective feeling that things were not happening in his case when a lot was occurring. We cannot say the court abused its discretion in drawing this conclusion based on the number and length of meetings defense counsel reported he or his office participated in.

Samaniego also expressed concerns about the discovery he was receiving. He complained his attorney was withholding discovery, that the discovery was provided too slowly, and that some discovery material was missing. He wanted his attorney to challenge the protective order that

resulted in redactions of some of the material, and his attorney failed to file such a motion. The trial court inquired about these concerns, but his attorney explained that he had little control over these issues. Defense counsel did not withhold discovery he had received from Samaniego at any point. The initial discovery came in the form of audio tapes, which Samaniego's attorney and his office played for Samaniego. Defense counsel requested the recordings that his office did not have but that Samaniego wanted, even those the attorney did not believe the prosecution planned to use and were not relevant. But Samaniego wanted transcriptions of the recordings, and those were not supplied by the district attorney. So, defense counsel supplied Samaniego with transcripts of the audio as his office completed the time-consuming task of transcribing the material. [¶] At hearings where this was the primary complaint, the court concluded that allegations that the attorney was not properly representing Samaniego fell flat, and once the court asked Samaniego to show more patience, noting that discovery was slow because of witness safety concerns necessitating redactions. The record reflects that counsel was adequately sharing discovery information with Samaniego. [¶] Further, with respect to complaints about redactions within the thousands of pages of written material, defense counsel told the court he had gone through each page with the district attorney, the district attorney believed the redacted items were not discoverable, and he said nothing relevant to the case had been blacked out. This was not a concern specific to Samaniego's attorney; redactions would have occurred because of witness safety concerns.

Samaniego challenged the adequacy of representation by questioning his attorney's experience and arguing that his attorney had failed to properly represent him at the juvenile transfer hearing. Samaniego complained that his attorney did not give him an opportunity to review the briefs seeking a determination that the juvenile court should retain jurisdiction, and those papers excluded information Samaniego thought was important. He also told the court his attorney failed to prove his [sic] was 17 at the time of the crime, failed to call helpful witnesses at the juvenile hearing, and he argued that his attorney should have challenged the juvenile court's finding. [¶] The court considered defense counsel's decade of experience, including cases involving violence, and determined the attorney's experience level was sufficient to adequately represent Samaniego. [¶] The court explained the reason the matter was being heard in juvenile court was because Samaniego was 17 at the time of the shooting, indicating his attorney did not fail to prove this. The court's impression of the witnesses called by defense counsel was different from Samaniego's; in its view, defense counsel had "done

everything he could do to get this case prepared for this removal hearing." The court explained to Samaniego that his attorney had filed a lengthy pleading which raised every possible issue that could be raised, and it explained that Samaniego's concerns regarded guilt or innocence, but that information would not have appropriately been before the juvenile court at that time. Finally, defense counsel filed a writ to challenge the juvenile court's determination, but the appellate court denied it. The court's review of these charges demonstrates they lacked merit. Thus, it was not an abuse of discretion to deny his *Marsden* motions for these reasons.

Some of Samaniego's other complaints were likewise unfounded. For example, Samaniego repeatedly told the court he did not trust his attorney because, he alleged, defense counsel had lied numerous times. When pressed, Samaniego specified that the lie was that his attorney knew the codefendants had become cooperating witnesses and lied about not knowing where those witnesses were housed. Defense counsel denied this, explaining no one had informed him the former codefendants would become cooperating witnesses, and at the time he discussed the issue with Samaniego, he believed both were in custody. The court concluded there was no credible evidence defense counsel had lied to his client. *Webster*, *supra*, 54 Cal.3d at p. 436 (with questions of credibility, court is "entitled to accept counsel's explanation(s)"). [¶] The other "lie" Samaniego identified was an alleged promise his attorney made to request bail reduction or a release on his own recognizance, along with agreeing to consider Samaniego's ideas. Samaniego's concern was a strategy-related one. And although counsel agreed to consider Samaniego's ideas, he decided against many of them. For example, defense counsel did not believe a bail reduction hearing was worth the risk of the court increasing the bail amount. The court viewed this complaint as one related to strategy, explaining that bail review requests were not common in certain instances because it makes the case more public and harder to seat an impartial jury. See *Alfaro*, *supra*, 41 Cal.4th at p. 1320. [¶] Samaniego also told the court he did not trust his attorney because his attorney was pressuring him to enter a plea agreement. Defense counsel clarified that he had discussed potential plea bargains, and later he provided Samaniego with a statement about what Samaniego might be willing to offer, and he told the court that Samaniego declined a nine-year stipulated offer. The court told Samaniego that defense counsel was required to address a potential plea with his client, and it explained that it would be rare in a case involving a murder charge for an attorney not to discuss that possibility. [¶] Samaniego's misconceptions about the role of an attorney and his tactical decisions are not sufficient to demonstrate inadequate

representation or irreconcilable differences; thus, the court's determination that these alleged "lies" or discussions about a potential plea could not form the basis of a substitution of counsel did not abuse discretion.

Samaniego's remaining complaints related to tactical and strategic decisions. He wanted his attorney to hire particular expert witnesses, to call certain witnesses at the preliminary hearing, and to file a section 995 motion to dismiss certain charges. His attorney explained that these tactics were considered. He told the court he did not believe the specific experts Samaniego wanted would assist in the case. He did not file a section 995 motion because a cooperating witness had testified at the preliminary hearing, and that was sufficient to bind the case over for trial. The court likewise explained to Samaniego why a section 995 motion may not have been strategically wise before denying the motion on that basis. [¶] We agree with the trial court that these decisions were tactical ones, left within the discretion of the attorney. As disagreements about tactical decisions do not constitute an irreconcilable conflict (*Cole*, *supra*, 33 Cal.4th at p. 1192), the court did not abuse its discretion by concluding these disagreements did not warrant a substitution of counsel.

Finally, we turn to Samaniego's concern that his attorney would not seek jury instructions for voluntary and involuntary manslaughter. While Samaniego may have been concerned about that, his attorney told the court that it would ask for those instructions, but it would depend on the state of the evidence, and it would be up to the court. The court considered this information before denying the motion, concluding that it appeared that defense counsel was working hard and in Samaniego's best interest. And counsel did request a voluntary manslaughter instruction, which, as we previously discussed, was not supported by the evidence. It does not appear that Samaniego's claim that his attorney did not consider his ideas was valid. Citing *McCoy v. Louisiana* (2018) ___ U.S. ___ (138 S.Ct. 1500), Samaniego implies that his disagreements with counsel were not about strategy for how to achieve his objectives, but about actual defense objectives. In *McCoy*, the attorney conceded guilt for three murders to avoid a death sentence even though the defendant wanted to pursue an acquittal. *Id.* at p. 1506. The Supreme Court held that the attorney could not force a defendant to concede guilt and could only make "strategic choices about how to best *achieve* a (defendant's) objectives." *Id.* at p. 1508. Samaniego attempts to cast his situation as similar to the defendant in *McCoy* by claiming that his defense objectives were not honored. But his claims do not show that defense counsel ignored Samaniego's objectives. Like the

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

defendant in *McCoy*, Samaniego's objective was to maintain his innocence, and defense counsel can make strategic choices for how to best achieve the objective. *Ibid.*

We recognize that Samaniego's January 16, 2019, request for a *Marsden* hearing was improperly denied, and Samaniego once again mentioned a conflict with the defense team without specifically requesting a *Marsden* hearing. However, these events do not constitute prejudicial error because the court subsequently held a *Marsden* hearing at which Samaniego an opportunity to express all his concerns and the court concluded he was receiving adequate representation. The court's denial of that motion did not abuse its discretion.

*Id.* at 71-77.

"[O]nce a request for substitute counsel has occurred, inquiry is required." *Bland v. California Department of Corrections*, 20 F.3d 1469, 1476 (9th Cir. 1994), overruled on other grounds by *Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000), citing *United States v. Robinson*, 913 F.2d 712, 716 (9th Cir. 1990). The matter for the reviewing court to decide is whether the purported trial court error in handling the motion for the substitution of counsel "actually violated [the petitioner's] constitutional rights in that the conflict between [petitioner] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." *Schell*, 218 F.3d at 1026. This is because "the Sixth Amendment does more than require the States to appoint counsel for indigent defendants. The right to counsel prevents the States from conducting trials at which persons who face incarceration must defend themselves without adequate legal assistance." *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980). However, this right does not include any right to a "meaningful relationship" in this respect. *See Morris v. Slappy*, 461 U.S. 1, 14 (1983) ("[W]e reject the claim that the Sixth Amendment guarantees a 'meaningful relationship' between an accused and his counsel.") (footnote omitted). Nor does this right allow for substitution of counsel when a defendant "refuses to cooperate

1  because of dislike or distrust" of counsel who remains "free of actual conflicts of

2  interest." *Plumlee v. Masto*, 512 F.3d 1204, 1211 (9th Cir. 2008) (en banc).

3       In determining whether there was an "irreconcilable conflict" between a defendant

4  and his counsel which required substitution, a reviewing court "must consider: (1) the

5  extent of the conflict; (2) whether the trial judge made an appropriate inquiry into the

6  extent of the conflict; and (3) the timeliness of the motion to substitute counsel." *Daniels*

7  *v. Woodford*, 428 F.3d 1181, 1197-98 (9th Cir. 2005), citing *United States v. Moore*, 159

8  F.3d 1154, 1158-59 (9th Cir. 1998). Addressing the latter two prongs first, Petitioner's

9  requests were clearly timely given he requested substitution of counsel numerous times

10  between June 2016 through July 2019. *See* ECF No. 14-46 at 54-70. The trial court

11  conducted a detailed and considered inquiry into Petitioner's asserted conflict with

12  counsel on nearly every one of the numerous occasions Petitioner raised concerns or

13  requested substitution of counsel. *Id.*

14       Turning to the third prong, the extent of the conflict between Petitioner and his

15  defense counsel, while Petitioner complained to the trial court that there was an

16  irreconcilable conflict stemming from distrust due to counsel's lies, inadequate attention

17  from counsel, slow and redacted discovery, counsel's inadequate performance, and

18  disagreements over strategy and tactics, the state court concluded that "the crux of his

19  disagreement was over strategy, not due to any conflict of interest, and the evidence in

20  the record shows that his distrust was not based in evidence, but only related to

21  Samaniego's misperceptions about the defense counsel's access to evidence." *Id.* at 14-46

22  at 71. The state court's conclusion appears both reasonable and well-supported by the

23  Court's review of the state record.

24       Petitioner's expressed distrust of counsel appears to have stemmed from his

25  subjective and largely misguided beliefs that (1) counsel was not spending enough time

26  with him, (2) counsel was withholding discovery from him, (3) counsel lied to him on

27  numerous occasions, (4) counsel had performed inadequately, particularly with respect to

28

the juvenile transfer hearing, and (5) counsel should comply with Petitioner's requests as to tactics and strategy rather than exercise counsel's own discretion in that regard.

First, while Petitioner complained on several separate occasions that counsel was not spending adequate time with him (*see e.g. id.* at 58, 60, 61, 65-66, 68, 70), Petitioner himself stated on at least two of those occasions that he considered the hour-long visits he had with counsel inadequate, stating in 2016 that he wanted "an attorney who would meet with him at least twice a week for two to three hours each meeting" and in 2019 that he "wanted to communicate with his attorney three times a week." *Id.* at 58, 70. In view of counsel's 2016 statements that both he and his investigator had visited Petitioner numerous times and Petitioner had not requested more frequent visits, counsel's 2017 statements that he "tried to visit [Petitioner] as often as possible, but he could not see his client as frequently as his client wanted," and that counsel's 16 visits in 2018 "averaged about two hours in length" and he spoke to Petitioner "approximately twice a month by phone" that year, and Petitioner's own admission that counsel met with him four times in the month or two prior to the July 31, 2019 hearing (*see id.* at 58-59, 61, 66, 70), the state court was not unreasonable in concluding that the trial court acted within its discretion in finding counsel spent adequate time with Petitioner. Moreover, despite the disagreement on what constituted an adequate amount of consultation time and at least one instance where Petitioner refused counsel's visit (*see id.* at 65), Petitioner and his attorney clearly continued to communicate throughout his representation and never had a conflict which resulted in a "total lack of communication" such that the relationship was ever rendered constitutionally infirm. *See Schell*, 218 F.3d at 1026.

Next, as to Petitioner's repeated complaint and assertion that the slow receipt of discovery was due to counsel's actions (*see* ECF No. 14-46 at 56, 59-62, 65-66, 68, 70), the trial court largely found these complaints unfounded and based on Petitioner's mistaken understanding of counsel's role in the discovery process. For instance, at the June 8, 2016, hearing, while Petitioner complained he "had requested full discovery over the preceding eight months and his attorney had not provided it to him," including

transcripts of audio recordings (*see id.* at 56), defense counsel stated that the prosecutor "had taken six weeks to share discovery" after repeated requests, redaction was required due to co-defendants who had become cooperating witnesses and the prosecution's failure to transcribe audio necessitated "time-consuming" efforts by the defense to do so before copies could be provided to Petitioner. *Id.* at 56-57. At later hearings at which Petitioner raised the issue of his repeated requests for additional discovery and complaints about delays (*see e.g. id.* at 60, 62, 65), counsel explained to the trial court that while some materials might not be relevant, his office had provided Petitioner materials as requested and as they became available (*id.* at 60), and explained that redactions due to cooperating witnesses required additional time and consultation with the prosecution to ensure that nothing of relevance had been blacked out. *Id.* at 62, 66, 68. The state court reasonably concluded that because witness safety concerns would necessitate redactions, Petitioner's complaints did not raise concerns about defense counsel's adequacy, and "[t]he record reflects that counsel was adequately sharing discovery information with Samaniego." *Id.* at 73.

The record similarly supports the state court's finding that Petitioner's complaints about counsel's purported lies were either "unfounded" or were based on "misconceptions" about counsel's role and did not provide grounds to conclude either that counsel was performing inadequately or that the asserted conflict was irreconcilable. *Id.* at 74-76. While Petitioner claimed at the June 8, 2016, hearing that his attorney lied about knowing that one co-defendant became a cooperating witness and the witness's location in jail (*see id.* at 56), counsel explained that when he discussed the co-defendants with Petitioner he was not yet informed of their cooperation and "believed both were in custody," and the trial court concluded that "it was not uncommon for the district attorney's office to take actions like persuading co[-]defendants to become cooperating witnesses without informing defense counsel." *Id.* at 57. At the December 8, 2018, hearing, Petitioner stated "he did not trust defense counsel because he had lied 'numerous times,' telling him he would request bail reduction or release on his own recognizance,"

as well as about "planning to visit him and agreeing to take into consideration [Petitioner's] ideas." *Id.* at 67. After hearing counsel's responses, the trial court "explained that bail review requests were not common in certain instances because it makes the case more public and harder to seat an impartial jury" and concluded that Petitioner's dissatisfaction was because "'[counsel] doesn't do it [Petitioner's] way,'" which did not provide grounds for substitution. *Id.* Relatedly, Petitioner's professed lack of trust due to counsel raising the issue of a potential plea (*see id.* at 63), also appears due to Petitioner's lack of understanding that counsel was required to relay and discuss plea offers with his client and the lack of such discussion "would be rare in a case involving a murder charge." *Id.* at 64.

Petitioner's assertions that counsel's performance was inadequate or that he did not have the requisite experience to represent Petitioner similarly fail to find support in the record or appear based on a misunderstanding of the nature of the proceedings at issue. At the June 8, 2016, hearing, Petitioner stated that his counsel was not "qualified or experienced enough for such a 'big' and high-profile case" (*id.* at 56), to which defense counsel "detailed his experience as a public defender over the course of approximately a decade, during which time he had handled thousands of cases and taken 50 cases to jury trial, including cases with serious crimes" (*id.* at 57), and the trial court concluded that "defense counsel was not unqualified simply because he had never sat first chair at a murder trial," given he "had participated in which trials as second chair and had handled other cases involving violence." *Id.* at 58. Petitioner's complaints about counsel's performance at the juvenile transfer hearing (*see id.* at 62-63, 68), appear based on confusion over the reasons for and subject of that hearing. For instance, at the October 15, 2018, hearing, the trial court noted that while Petitioner's focus was on guilt, "that was not considered in the juvenile court hearing, where the issue was whether the case should be litigated in juvenile court or adult court." *Id.* at 64. As to Petitioner's complaints at the March 4 and March 8, 2019, hearings, that "defense counsel had failed to prove he was 17 at the time of the alleged crime," defense counsel explained that "the

whole reasons they were before the juvenile court was because [Petitioner] met the age requirement," and noted "there is a presumption of guilt in juvenile court." *Id.* at 68. Given Petitioner's contentions fail to find record support, the state court was not unreasonable in affirming the trial court's finding that Petitioner's complaints "lacked merit." *Id.* at 74.

The Court next turns to Petitioner's contention that trial counsel's disagreements with him over strategy and tactics, including witness subpoenas, the hiring of certain experts, filing of motions, and requests for jury instructions demonstrated the extent of their disagreement and irreconcilable nature of their conflict and addresses Petitioner's assertion that he should have been allowed to make those choices instead of counsel. ECF No. 1-3 at 27-32.

The Court first addresses Petitioner's contention that pursuant to *McCoy v. Louisiana*, 584 U.S. 414 (2018), a "conclusion defense counsel is the 'captain of the ship' and 'it is counsel, not the defendant, who is in charge of the case,' appears erroneous" and that as a result, "[c]ounsel should have been required to more than just listen to [Petitioner]." ECF No. 1-3 at 29 (citations omitted). But *McCoy* clearly held only that "it is the defendant's prerogative, not counsel's, to decide on the *objective* of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt." *McCoy*, 584 U.S. at 417-18 (emphasis added). Indeed, the *McCoy* Court explicitly noted that "[t]rial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.'" *Id.* at 422, quoting *Gonzalez v. United States*, 553 U.S. 242, 248 (2008). Thus, the state court correctly and reasonably determined that "[l]ike the defendant in *McCoy*, Samaniego's objective was to maintain his innocence, and defense counsel can make strategic choices for how to best achieve the objective." ECF No. 14-46 at 77.

As the state court also reasonably determined, "the crux" of Petitioner's conflict with counsel "was over strategy." *Id.* at 71. For instance, at the June 8, 2016, hearing, Petitioner "complained that his attorney did not want to subpoena all the witnesses," as Petitioner wanted to do, to which defense counsel told the trial court that "he had a difference of option regarding subpoenaing every possible witness, and that was a strategy decision." *Id.* at 56-57. Similarly, in response to Petitioner's complaints at the April 11, 2017, hearing that "his attorney did not want to hire a gun expert, a forensic evidence expert, or a false statement expert," counsel explained that "the expert witness decisions were strategic ones" and that "he did not believe the specific experts [Petitioner] wanted would assist in the case, and if there were an expert who would assist, he would consider using that person." *Id.* at 60. The trial court agreed with counsel, noting that such decisions were strategic and based on counsel's experience, and that "it could hurt" or "do damage" to Petitioner's case to call every witness at the preliminary hearing or use some of the experts Petitioner sought. *See id.* at 57, 61. With respect to Petitioner's complaints at the December 4, 2018, March 4, 2019, and March 8, 2019, hearings that counsel did not file a bail reduction motion, section 995 motion, or a second motion to challenge the outcome of the juvenile transfer hearing as Petitioner wanted, the trial court again agreed with counsel that such decisions were strategic, within the purview of counsel, and may not be sound strategy in any event. *See id.* at 64-69. As to Petitioner's complaints that counsel failed to request instructions on voluntary and involuntary manslaughter, counsel stated that "he would ask" for those instructions, "but it would be up to the court and depend on the state of the evidence." *Id.* at 70. As the state court correctly and reasonably observed, counsel sought a manslaughter instruction, which the trial court denied. *Id.* at 76. Given the disagreement outlined here was again over counsel's strategic and tactical decisions rather than defense objectives, the state court was not unreasonable in concluding that because "disagreements about tactical decisions do not constitute an irreconcilable conflict, the court did not abuse its discretion by concluding these disagreements did not warrant a substitution of counsel." *Id.* (internal

citation omitted); *see Larson v. Palmateer*, 515 F.3d 1057, 1067 (9th Cir. 2008) (affirming denial of request for substitution of counsel where defendant had "complained solely about his counsel's strategic decisions and lack of communication with him, including that his counsel did not make motions that he requested, contacted witnesses without his consent and did not present him the list of defense witnesses for his approval," and noting that "no Supreme Court case has held that 'the Sixth Amendment is violated when a defendant is represented by a lawyer free of actual conflicts of interest, but with whom the defendant refuses to cooperate because of dislike or distrust.'"), quoting *Plumlee*, 512 F.3d at 1211; *see also Stenson v. Lambert*, 504 F.3d 873, 886 (9th Cir. 2007) ("Disagreements over strategical or tactical decisions do not rise to level of a complete breakdown in communication."), citing *Schell*, 218 F.3d at 1026.

Finally, the Court briefly addresses Petitioner's contention that the trial court prejudicially erred in not holding a hearing on every single one of Petitioner's requests for the substitution of counsel. *See* ECF No. 1-3 at 27. The Court agrees with the assessment of the state court that the denial of one hearing on a single requested occasion and the failure to hold a hearing on another occasion in view of Petitioner's complaints about counsel did not result in prejudice, given the trial court held hearings to inquire into the basis for Petitioner's complaints about trial counsel on numerous occasions both before and after the occasions in question and the outcome of each of those hearings was the same.

For the reasons discussed above, Petitioner fails to show the state court rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable factual determination. Thus, habeas relief is not available as to Claim 3.

### D.    Claim 4- Exclusion of Impeachment Evidence

Next, Petitioner contends the trial court erred in refusing to allow the defense to introduce criminal history evidence as to Palomino and Aranda, apart from Palomino's felony conviction, which prevented Petitioner from challenging the witnesses' credibility

and the reliability of their testimony and violated his federal constitutional right to due process, a fair trial, to present a defense and to confront and cross-examine witnesses. ECF No. 1 at 9, ECF No. 1-3 at 33-34.

As noted above, the Court looks to the decision of the state appellate court, which first outlined the evidence that Petitioner sought to introduce, as follows:

> Samaniego moved in limine to admit the arrests and convictions of Aranda and Palomino. He sought to include evidence of Aranda's convictions:  misdemeanor possession of an unlawful knife, misdemeanor driving on a suspended license, disturbing the peace, a driving under the influence related offense that included an excessive alcohol blood level enhancement, and contempt of court. Samaniego also sought the admission of several arrests: three arrests for alien smuggling, inflicting corporal injury on a significant other, preventing or dissuading a witness from testifying, contempt of court, and an out-of-state failure to appear charge. [¶] At the hearing on the motions, defense counsel described Aranda's list of prior offenses as "pretty extensive," but when the court commented that a lot of them were "just contacts," defense counsel agreed that a lot were "contacts or no files." Defense counsel explained that many of the files were purged based on age. The court said it did not see conduct indicating moral turpitude or felony convictions, and defense counsel said there was a domestic violence arrest in 2000. But the court said it was only an arrest, not a conviction, and so not admissible. If defense counsel provided a prior conviction, the court would rule on it, but the court had not seen anything that it could grant.
>
> The defense also sought to introduce numerous arrests and convictions for Palomino. It asked to introduce the following convictions: (1) a 1998 infraction for resisting arrest; (2) a 1998 misdemeanor public nuisance; (3) a 1999 felony burglary; (4) a misdemeanor battery and reckless driving; (5) a 2007 conviction for driving under the influence and on a suspended license; (6) an infraction for public fighting in 2012; and (7) a 2014 felony for driving under the influence of alcohol. The defense also wanted to impeach Palomino using several arrests for driving on a suspended license, driving under the influence of alcohol, possession of narcotics paraphernalia, being under the influence of a controlled substance, resisting arrest, and contempt of court. [¶] In discussing Palomino's prior misconduct, defense counsel explained there was a felony DUI and the remaining convictions were misdemeanors. The court agreed to permit reference Palomino's felony DUI, but it explained misdemeanor DUI did not

constitute moral turpitude. [¶] At trial, Palomino testified that he considered himself to be an alcoholic and he had been convicted four times for driving under the influence.

ECF No. 14-46 at 18-19. As to Aranda, the state court found: "The evidence Samaniego sought to introduce against Aranda was remote in time to Aranda's testimony, with arrests dating back two decades," that the evidence "also was incomplete, with unknown dispositions and purged files because of their age," and "[t]he defense offered no specific proof regarding the conduct underlying arrests, so there were problems of proof that at a minimum would have consumed time to address," and thus concluded: "Given the uncertainty regarding the alleged unlawful conduct, its remoteness in time, and its lack of relevance to moral turpitude, we cannot say that the court abused its discretion by excluding these details." *Id.* at 21. (citations omitted) As to Palomino, the state court found: "Other than the 1999 felony burglary, none of Palomino's excluded convictions necessarily involved crimes of moral turpitude," and that "as was the case with Aranda, introducing Palomino's arrests would have entailed problems of proof; Samaniego did not offer evidence that Palomino committed these crimes, merely that Palomino was arrested." *Id.* at 22. The state appellate court also found no prejudice from the exclusion, reasoning as follows:

> While we conclude that the court did not abuse its discretion by excluding the evidence of most of the witnesses' prior arrests and convictions, we also note that there is no reason to believe this decision prejudicially harmed Samaniego.
>
> Although defense counsel did not use evidence of past arrests and misdemeanor convictions to impeach the witnesses, defense counsel challenged the witnesses' credibility in other ways. Aranda was questioned about participation in gang activity, and defense counsel pointed out various lies. Aranda admitted that he had lied to law enforcement, and his charges were reduced from first-degree murder to accessory after the fact only after he began to cooperate with the district attorney. During closing arguments, defense counsel argued that Aranda was not a credible witness, that he had colluded with Palomino to lie, and that if he were really afraid of cooperating with police, he would not have voluntarily gone to the police

station the night of the shooting. [¶] The defense also challenged Palomino's credibility. Palomino admitted to drinking three of four drinks the night of the shooting. He testified that when police contacted him, he said he was not there, and he did not tell police what happened. He also testified to being an alcoholic, drinking since the age of 13 or 14, being convicted of three or four DUIs, and he said he was a drug addict. Although he did not go into detail, Palomino mentioned that he was at his probation officer's office when police asked him about the shooting in 2015, and he cut off his ankle bracelets but was arrested a couple months later. During closing arguments, defense counsel described Palomino as "a mess"—an alcoholic with a "ton of DUI's" who was a drug user. He commented that Palomino's body language indicated he did not want to testify, and that only the real shooter would have willingly taken credit for shooting Aranda—something Palomino had indicated he would do. Defense counsel also argued that Palomino's story was inconsistent with the facts because he could not remember anyone walking from Gloria's door to the car, but he did remember the car mysteriously appearing and making a U-turn. [¶] The jury was instructed with CALCRIM No. 316, which told it to consider whether a witness was convicted of a felony, a crime, or other misconduct in evaluating credibility. Thus, the jury had reason to question the witnesses' credibility in evaluating the evidence.

However, the challenges to these witnesses' credibility could easily be overcome by the evidence that pointed to Samaniego as the shooter. Edgar identified Samaniego as the shooter. Palomino's mother told police that Palomino told her immediately following the shooting that Samaniego had shot someone. Other testimony showed that Aranda was not the shooter. For example, Edgar, Gloria, and Aranda all agreed that when Edgar left Gloria's home, there was no conflict between him and Aranda, eliminating any motive for Aranda to be involved in the crime. Edgar's testimony also placed Aranda behind the shooter, appearing only after the shooting started and disappearing shortly thereafter. Although Edgar offered Aranda's nickname "Kiki" in the minutes immediately following the shooting, once he recovered, he did not identify Aranda as the person who shot him.

Additionally, Samaniego's defense was primarily a misidentification defense, and the two perpetrators had different appearances. Witnesses testified that Palomino was darker-skinned and older than the person witnesses described as the shooter. Edgar described the shooter as Hispanic and the other person as possibly mixed-race, Puerto Rican, or Black. He said the shooter was about five feet eight inches tall and wore a sweater with two

grey stripes across the chest and sleeves. Isidro O.'s description was similar. He said the shooter wore a striped shirt and was white, with short hair, about five foot nine to five foot ten. In addition to the differences in skin tone, the two assailants had different hair styles. The shooter had slicked-back, collar-length hair, and the other person had short hair, all one length. [¶] Samaniego's attorney argued that Samaniego did not fit the description of the shooter because he did not have slicked-back, collar-length hair. But there was testimony that starting around the time of the shooting, when Samaniego was 15 years old, he was bald except for a tail on the back of his head, visible only if the hair were pulled around the sides. Aside from the tail, which was long, Samaniego kept his head shaved tight. DMV photos of Samaniego in 2011 matched the description of the shooter that Edgar had provided. And police reviewing a photograph of Samaniego taken near the time of the shooting and included with a field interview noted similarities between the description of the shooter and Samaniego and believed a 2011 photograph of Samaniego showed facial similarities to the composite of the shooter. Thus, witness descriptions of the shooter matched Samaniego's appearance at the time, and the description of a tail Samaniego wore explained the potential differences in the description of the hairstyle.

Further, Samaniego's post-arrest behavior pointed to him as the shooter. He made threats to Aranda when they were placed in the same holding cell, saying he would deal with witnesses his own way and that he could get at anybody he wanted. Police were also concerned by information that Samaniego was looking for the location of cooperating witnesses while he was in custody.

Given this evidence against Samaniego, it is not reasonably probable a different outcome would have been achieved even had additional, potentially non-verifiable challenges to the credibility of Aranda and Palomino been offered at trial. See *People v. Watson* (1956) 46 Cal.2d 818, 836-837 (*Watson*); *People v. Ghebretensae* (2013) 222 Cal.App.4th 741, 751-752 (*Watson* standard applies to evaluate exclusion of impeachment evidence.)

ECF No. 14-46 at 22-25.

Again, "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane*, 476 U.S. at 690, quoting *Trombetta*, 467 U.S. at 485; *see also Holmes*, 547 U.S. at 324 (same). "While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of

1   evidence permit trial judges to exclude evidence if its probative value is outweighed by

2   certain other factors such as unfair prejudice, confusion of the issues, or potential to

3   mislead the jury." *Holmes*, 547 U.S. at 326.

4       Additionally, "[t]he Sixth Amendment to the Constitution guarantees the right of

5   an accused in a criminal prosecution 'to be confronted with the witnesses against him.'"

6   *Davis v. Alaska*, 415 U.S. 308, 315 (1974); *see also Delaware v. Van Arsdall*, 475 U.S.

7   673, 678 (1986). Yet, the right to cross-examination is not unlimited, as "trial judges

8   retain wide latitude insofar as the Confrontation Clause is concerned to impose

9   reasonable limits on such cross-examination based on concerns about, among other

10   things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation

11   that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679; *see also id.*,

12   quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) ("[T]he Confrontation Clause

13   guarantees an *opportunity* for effective cross-examination, not cross-examination that is

14   effective in whatever way, and to whatever extent, the defense might wish.")

15       Defense counsel acknowledged that while Aranda's priors were "pretty extensive,"

16   that "[a] lot of them are contacts or no files" and while it had asked the prosecution for

17   police reports, that "based on the age of them, many of them were purged." RT 1024. The

18   trial court noted a lack of anything that was moral turpitude or felony convictions, only

19   arrests, which would not be admitted. RT 1025. Given Aranda's prior record appeared to

20   include arrests as opposed to convictions, much less any felony convictions or any

21   involving moral turpitude, the trial court's ruling appears to fall squarely within the "wide

22   latitude" provided to the trial court on setting limits to the proposed cross-examination.

23   *Van Arsdall*, 475 U.S. at 679.

24       With respect to Palomino, the trial court admitted Palomino's felony DUI

25   conviction, noting: "That's moral turpitude. Okay." RT 1026. Defense counsel again

26   acknowledged that the "[o]ther [convictions], though voluminous, are misdemeanors,"

27   and the trial court, in distinguishing between Palomino's DUI convictions, specifically

28   noted that while the felony DUI was moral turpitude, a misdemeanor DUI was not. RT

1026-27. This ruling similarly appears to fall well within the "wide latitude" allowed the trial court. *Van Arsdall*, 475 U.S. at 679.

Even in the event Petitioner was somehow able to show any error in excluding this prospective impeachment evidence amounted to federal constitutional error, he must still also demonstrate its exclusion had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. In addition to concluding there was no abuse of discretion in excluding the proffered criminal histories, the state court also found a lack of any demonstrated prejudice. ECF No. 14-46 at 22-25. In so concluding, the state court applied the state law *Watson* standard rather than the federal prejudice standard. The Ninth Circuit has explained the difference between the standards as follows: "The *Watson* standard is used to review non-constitutional, trial type errors," while "[i]n contrast, the more stringent standard, under *Chapman v. California*, is used to review errors of constitutional magnitude." *Hall v. Haws*, 861 F.3d 977, 989 n.7 (9th Cir. 2017).

Upon review, the state court's decision again appears reasonable and abundantly supported by the record. As the state court thoroughly detailed, defense counsel extensively impeached both Aranda and Palomino with their prior lies to police, inconsistencies in their accounts of events, that they were both only testifying due to cooperation agreements and reduced charges, Aranda's gang activity and Palomino's substance use, abuse, and prior DUI conviction. *See* ECF No. 14-46 at 22-23. As the state court also recognized (*see id.* at 23), the trial court instructed the jurors that factors to consider in their evaluation of a witness's testimony included whether the witness "ma[d]e a statement in the past that is consistent or inconsistent with his or her testimony," as well as whether the witness "admit[ted] to being untruthful," had "been convicted of a felony," had "engaged in other conduct reflecting on his or her believability," or was "promised immunity or leniency in exchange for his or her testimony." RT 2236-37. The trial court also directed the jurors that: "If you decide a witness deliberately lied about something significant in the case, you should consider not

believing anything the witness says. Or, if you think the witness lied about some things, told the truth about others, you may simply accept the part that you think is true and ignore the rest." RT 2237. Thus, even if admitted, the proffered evidence of additional prior criminal conduct, which was admittedly attenuated by age and primarily involved arrests rather than convictions, would have added little to the similar impeachment evidence that had already been introduced to challenge the credibility of Aranda or Palomino.

Given defense counsel had ample opportunity to cross-examine both Aranda and Palomino on their testimony and challenged their credibility by raising their prior inconsistent statements and/or lies to police, Aranda's gang activity, Palomino's prior DUI conviction as well as his alcohol use on the night of the incident, and the witnesses' deals for cooperation, the Court is not persuaded the exclusion of the proffered impeachment evidence amounted to federal constitutional error, and even in the event Petitioner could somehow demonstrate it did, he fails to show any such error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637; *see also Ayala*, 576 U.S. 257, 270 (2015) ("[A] prisoner who seeks federal habeas corpus relief must satisfy *Brecht*, and if the state court adjudicated his claim on the merits, the *Brecht* test subsumes the limitations imposed by AEDPA."), citing *Fry v. Pliler*, 551 U.S. 112, 119-20 (2007). Petitioner fails to show the state court decision is either contrary to, or an unreasonable application of, clearly established federal law, or is based on an unreasonable determination of the facts. Claim 4 does not merit federal habeas relief.

## I.     Claim 9- Prosecutorial Misconduct

Next, Petitioner asserts that prosecutorial misconduct during closing arguments, namely asking the jury to view the case through the victims' eyes and pleading for justice, misstating the evidence, and improper vouching, violated his federal constitutional rights to due process, an impartial jury, and a reliable verdict under the Fifth, Sixth and Fourteenth Amendments. ECF No. 1 at 21, ECF No. 1-3 at 46-48.

As an initial matter, Respondent asserts Petitioner defaulted Claim 9 by failing to object to the purported misconduct at trial and the claim is barred from federal review. *See* ECF No. 13-1 at 31. Again, the Court looks to the opinion of the state appellate court, which found this claim was forfeited for failing to object at trial and alternatively found it also failed on the merits. *See* ECF No. 14-46 at 46.

"A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012) (citations omitted). "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

California's contemporaneous objection procedural bar has been found both adequate and independent to bar federal review. *See Melendez v. Pliler*, 288 F.3d 1120, 1125 (9th Cir. 2002) ("We held more than twenty years ago that the rule is consistently applied when a party has failed to make *any* objection to the admission of evidence."), citing *Garrison v. McCarthy*, 653 F.2d 374, 377 (9th Cir. 1981); *see also Fauber v. Davis*, 43 F.4th 987, 1002 (9th Cir. 2022) ("We have repeatedly recognized California's contemporaneous objection rule as 'an adequate and independent state law ground' that forecloses our review.") (collecting cases). Here, Petitioner does not attempt to assert, much less demonstrate, cause and prejudice for this default. Nor does Petitioner indicate or attempt to show that the Court's failure to consider this claim would result in a fundamental miscarriage of justice. Thus, the Court must conclude Claim 9 is defaulted.

Notwithstanding the Court's conclusion that this claim is procedurally defaulted, it is apparent Claim 9 also fails on the merits. In addition to concluding Petitioner forfeited

this claim of error for failing to object at trial, the state appellate court also found the claim failed on the merits, as follows:

1. *References to Justice*

a. Additional Facts

Several times throughout the closing argument, the prosecutor told the jury the case was about getting justice. After asking the jurors to come to a "reasonable and just decision," he told them the case was really about "finding justice and finding the truth and finding closure for Alex ( )." He said the case was Alex's "opportunity to be heard through the evidence and his opportunity to find justice . . . ." He continued: "It's also about Edgar . . . . This was his opportunity to take that stand and get justice and to be heard. And that's what really this case is all about. When it's over, from the beginning until the end, that's really what it's about." [¶] The prosecutor told the jury: "(W)hat's sad about cases like this is they are dirty. They're not like what you would like to see. There's no DNA. There's no video. There's nothing there. But do we just throw away cases like that and say, well, we don't have that, so let's not follow up with tips we get from crime stoppers or from confidential informants because they're dirty or they're not clean like DNA? Or do we want to find justice?" [¶] Near the end of his closing argument, referencing Aranda and Palomino as cooperating witnesses, the prosecutor said, "If you believe that we gave the other two a deal that is way too sweet, that's on me. That's on my office. That's not on Edgar ( ). That's not on Alex ( ). So even if you believe that, don't just throw out everything because you think we screwed up, which we didn't. But don't let the defense convince you of that because that's not justice. That's not teaching anybody a lesson. You're not teaching the government or the people a lesson. You're punishing Edgar ( ) and you're punishing Alex ( )."

In his rebuttal, after explaining why the People concluded it was not Aranda or Palomino who shot Edgar and Alex, the prosecutor explained, "We're trying to find the truth. We're trying to find what's going on. . . . We're looking for the shooter in this case. We want justice, and that's what happened." [¶] Near the end of his rebuttal, the prosecutor concluded: "So as I started and I will end you with, if you look at all the evidence and you look at it in a reasonable manner, and you—and you realize what we're here to do—and as I started, I said we're here to find justice. We're here to find the truth. We're here to find the truth for Edgar ( ) and we're here to find the truth for Alex (). That's what we're doing. That's what this case is about is

64

1
2
hearing their voices and finding the truth and holding the defendant
accountable for what he did and what happened in this case."

3
b. Analysis

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
Viewed in the full context of the closing argument, the prosecutor's
comments did not rise to a level of denying Samaniego the right to a fair
trial. The prosecutor did not rely on passion to persuade the jury about
Samaniego's guilt. He asked the jury to be reasonable in its evaluation of the
evidence and its decision-making. He told the jury the People bore the
burden of proving Samaniego's guilt beyond a reasonable doubt, and the
People had to prove that Samaniego did not act in self-defense. The
prosecutor spent the vast majority of the closing arguments explaining why
the evidence supported the People's theory that Samaniego was the shooter,
discussing the elements of the various charges against the defendant,
explaining why the jury should conclude Samaniego acted with the required
malice aforethought, and why the shooting was deliberate. He acknowledged
the conflicting stories presented by Edgar and Palomino and argued why the
jury should believe Edgar. The prosecutor explained why the evidence
pointed to Samaniego as the shooter and not to one of the other witnesses,
identifying the corroborating evidence and similarity of several of the
witnesses' recitations of the events. [¶] And the prosecutor's rebuttal
comment that "we want justice" was made in the context of explaining that
the People sought the truth and that it was Samaniego and not Aranda who
shot Edgar and Alex. Taken together, these comments show the prosecutor
was requesting a just and reasonable verdict based on the evidence, and it is
not reasonably probable that absent these comments the jury would have
reached a different conclusion. See *Crew*, *supra*, 31 Cal.4th at pp. 839-840.

20
21
22
23
24
25
26
Although we conclude that these comments were not so impassioned
or so inflammatory that they give rise to bias that prejudiced the defendant
or caused an unfair trial, we disapprove of the prosecutor's references to the
jury as present at the trial to "find justice." Communities are served by jurors
doing their work in a lawful, unbiased fashion. See *People v. Fields* (1983)
35 Cal.3d 329, 362 (appeals to passion and prejudice invite departure from
duty to view evidence objectively). The job of "doing justice for the victim"
is not the jury's. The role of a jury is to apply to the law fairly and even-
handedly to the facts, whether this leads to a conviction or an acquittal.

27
/ / /
28
/ / /

## 2. *References to Crime Stoppers*

### a. Additional Facts

While discussing how Detective Adams came into the information that led to reopening the case, the prosecutor explained that she got her information from confidential informants. The prosecutor said that a juror might think, "'I don't like this whole confidential informant thing, you know? This doesn't sound right.'" But "That's what we have. We have Crime Stoppers. We have different things where people can call in and can anonymously give information. And think about this. This is a case where people know what happened, but nobody can talk about it. So, in order to find justice, in order to get the voice for the victims in this case, we have to listen to voices of people that don't want to get involved. And that's what gets them on the radar. That's what gets Palomino—and that's where Palomino's name comes up. . . ."

### b. Analysis

The prosecutor did not tell the jurors the information used to solve the crime came from an anonymous caller to Crime Stoppers. He referred to Crime Stoppers as one example of the types of anonymous information police relied on to solve some crimes. And he did this in the context of explaining that police relied on anonymous or confidential sources when investigating crimes in a community where the public was reluctant to share information with police for fear of retaliation, as was the case here. He also made the reference to rebut the implication that the information was inaccurate because of its confidentiality or anonymity, commenting that tips from Crime Stoppers or confidential informants might be "dirty," but they were necessary. The prosecutor did not misstate the evidence on this point.

As we previously noted, even if these various statements Samaniego now complains of were to have risen to the level of misconduct, none of them was so serious that an objection and admonition would have been inadequate to cure the harm; thus, the argument is forfeited. *Wharton*, *supra*, 53 Cal.3d at p. 566. Finally, the trial court instructed the jury that arguments were not evidence, and that it was up to the jury to decide facts based on evidence. See CALCRIM Nos. 200 & 222. We presume the jury understood and followed these instructions. *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1178.

1    ECF No. 14-46 at 47-51.

2         To state a claim of prosecutorial misconduct, a petitioner must demonstrate that the

3    alleged misconduct "'so infected the trial with unfairness as to make the resulting

4    conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986),

5    quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Alleged instances of

6    misconduct must be reviewed "in the context of the entire trial." *Donnelly*, 416 U.S. at

7    639; *see also Greer v. Miller*, 483 U.S. 756, 765-66 (1987), citing *Darden*, 477 U.S. at

8    179 and *Donnelly*, 416 U.S. at 639. This is because "the touchstone of due process

9    analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the

10   culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Again, habeas

11   relief is not available unless such error is shown to have had a "substantial and injurious

12   effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

13        Upon review, the state appellate court's conclusion that "[v]iewed in the full

14   context of the closing argument, the prosecutor's comments did not rise to a level of

15   denying Samaniego the right to a fair trial" (ECF No. 14-46 at 49), appears reasonable

16   and supported by the record.  As the state court correctly noted, "the vast majority" of the

17   prosecutor's arguments were centered on discussing the elements of the charged crimes,

18   the evidence that supported the prosecution's theory of the case and specifically that

19   Petitioner committed the crimes deliberately and with purpose.

20        Moreover, the prosecutor's contested comments on justice were made in the

21   context that they sought to find justice by finding the truth of what occurred that evening

22   and to hold the perpetrator accountable. *See e.g.* RT 2313. ("But what this case is really

23   about, what it all boils down to, is it's really about Alex[], and it's really about finding

24   justice and finding the truth and finding closure for Alex[]."); *see* RT 2385 ("We're

25   looking for the shooter in this case. We want justice, and that's what happened."); *see* RT

26   2388 ("[W]e're here to find justice. We're here to find the truth. We're here to find the

27   truth for Edgar [] and we're here to find the truth for Alex []. That's what we're doing.

28   That's what this case is about is hearing their voices and finding the truth and holding the

defendant accountable for what he did and what happened in this case.") Given the context in which those comments occurred, the Court remains unpersuaded they rendered Petitioner's trial unfair in violation of due process.

As for the comments about crime stoppers, the Court agrees with the assessment of the state court and rejects Petitioner's contention that such comments constituted "misstated the evidence" by asserting Petitioner's name came up from Crime Stoppers. ECF No. 1-3 at 46. Instead, while the prosecutor was noting that police received information from confidential informants in the instant case, and while the jury might not like the fact that confidential informants were involved but that they had "crime stoppers" as well as "different things where people call in and can anonymously give information" and in cases such as this "where people know what happened, but nobody can talk about it," it was necessary to "have to listen to voices of people that don't want to get involved." RT 2342. The prosecutor clearly used the term crime stoppers as an example and not as an indication of exactly how Petitioner's name surfaced in the case. Thus, the Court finds no misconduct in the cited reference.

To the extent Petitioner continues to assert the prosecutor purportedly committed misconduct by vouching for Aranda and Palomino (*see* ECF No. 1-3 at 47, citing RT 2385), which does not appear to have been specifically addressed by the state court, a review of the record does not reflect any such improper vouching. Instead, the prosecutor appears to have merely noted that while there might potentially be "other theories" concerning the involvement of Aranda and Palomino, there was a lack of evidence in support of alternate conclusions, noting for instance that Edgar testified Aranda was not the shooter. *See e.g.* RT 2385 ("And there's other theories that I can go on with Mr. Aranda. There's other theories that I can go on with Mr. Palomino. But would that deserve a sentence of life in prison for them being there? No. . . . And like I said, Aranda, it would be hard to put him away for life based on the evidence that I had.") Instead, given Gloria's testimony that Aranda was with her when the shots were fired coupled Edgar's testimony that Aranda was not the shooter as well as the fact that Palomino did

not match the description of the shooter, being older and darker skinned, but was instead similar to the description of the non-shooter, the prosecutor's argument appears reasonable and based on the evidence presented at trial. *See Menendez v. Terhune*, 422 F.3d 1012, 1037 (9th Cir. 2005) ("The prosecutor may argue reasonable inferences from the evidence presented, which is precisely what [he] did here."), citing *United States v. Young*, 470 U.S. 1, 8 & n.5 (1985). Finally, as the state court correctly observed (*see* ECF No. 14-46 at 51), trial court also instructed jurors arguments were not evidence. *See* RT 2233 ("Nothing the attorneys say is evidence. In their opening statements and closing arguments, the attorneys are going to discuss the case, but their remarks are not evidence.") Again, the jury is presumed to understand and follow the trial court's instructions. *See Weeks*, 528 U.S. at 234; *Marsh*, 481 U.S. at 211.

Thus, for the reasons discussed, a review of the alleged misconduct "in the context of the entire trial," *Donnelly*, 416 U.S. at 639, fails to persuade the Court that Petitioner's trial was rendered unfair. *See Smith*, 455 U.S. at 219 ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.") Nor does Petitioner demonstrate the existence of constitutional error, much less error that plausibly had any "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

Because Petitioner fails to show the state court rejection of Claim 9 either contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts, Claim 9 does not merit federal habeas relief.

## J.    Claim 10- Ineffective Assistance of Counsel

Petitioner next contends that trial counsel rendered ineffective assistance in violation of his federal constitutional rights in failing to (1) object to the instances of prosecutorial misconduct in closing arguments, (2) request relevant jury instructions on self-defense and object to the instruction containing the witness certainty factor, (3) argue

69

provocation and self-defense, and (4) object to improper witness opinions and improper

testimonial hearsay. ECF No. 1 at 22, ECF No. 1-3 at 48-52.

The Court looks to the decision of the state appellate court, which rejected

Petitioner's claim of error, reasoning in relevant part as follows:

> While we do not know specifically why Samaniego's attorney made
> the strategic decisions he did, we do not conclude that they clearly or
> obviously demonstrated ineffective assistance. For example, we can glean
> that he decided not to request CALCRIM No. 350 because the record does
> not reveal that there was substantial evidence of a character trait which
> would create doubt regarding Samaniego's guilt. Similarly, defense
> counsel's failure to object to certain testimony by Detective Adams about
> the similarities between Samaniego's DMV photographs and the composite
> developed by Edgar may have been because he was challenging that action
> by arguing the photographs were not actually all that similar, using
> testimony from the expert to make this point. We simply do not know on
> this record why defense counsel made the strategic decisions he did, and we
> are not inclined to speculate. [¶] If Samaniego has a remedy for this claim, it
> is by a separate habeas corpus petition in the trial court, and we note no such
> companion petition was filed in this matter.

ECF No. 14-46 at 52.

"[A] defendant must show both deficient performance by counsel and prejudice in

order to prove that he has received ineffective assistance of counsel." *Knowles v.

Mirzayance*, 556 U.S. 111, 122 (2009), citing *Strickland v. Washington*, 466 U.S. 668,

687 (1984). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v.

Kentucky*, 559 U.S. 356, 371 (2010). "When a convicted defendant complains of the

ineffectiveness of counsel's assistance, the defendant must show that counsel's

representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S.

at 687-88. Further, "a court must indulge a strong presumption that counsel's conduct

falls within the wide range of reasonable professional assistance; that is, the defendant

must overcome the presumption that, under the circumstances, the challenged action

'might be considered sound trial strategy.'" *Id.* at 689. To demonstrate prejudice, a

petitioner must show "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112. Moreover, when a federal habeas court is reviewing a claim of ineffective assistance of counsel previously adjudicated on the merits by a state court:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, *supra*, at 410, 120 S.Ct. 1495. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Richter*, 562 U.S. at 101. "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 105.

First, with respect to Petitioner's assertion trial counsel should have objected to several comments made during closing arguments, the Court found no misconduct. *See* Claim 9, *supra*. Thus, Petitioner cannot persuasively show trial counsel acted in a constitutionally deficient manner in failing to object. Given the context in which the comments about justice were made, the reference to crime stoppers was clearly an example and because the record fails to support Petitioner's assertion of improper vouching, trial counsel's lack of objection also falls well within the scope of "reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see also United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993) ("Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is

within the 'wide range' of permissible professional legal conduct."), citing *Strickland*, 466 U.S. at 689.

The Court next turns to Petitioner's allegations that trial counsel acted deficiently with respect to jury instructions, failed to argue provocation and self-defense, and failed to object to certain witness testimony. With respect to these alleged failures, the state court reasonably noted that: "We simply do not know on this record why defense counsel made the strategic decisions he did, and we are not inclined to speculate." ECF No. 14-46 at 52.  Again, the Court must "indulge a strong presumption" trial counsel acted "within the wide range of reasonable professional assistance" in deciding how to present Petitioner's case. *See Strickland*, 466 U.S. at 689. First, as to at least some of the contested testimony, the Court is in accord with state court's assessment that the record appears to reflect reasons that support counsel's actions, including that the purported failure to object to police testimony about the similarities between Petitioner's photos and the composite photo could have been because counsel instead chose to contend the photos were in fact not similar. *See* ECF No. 14-46 at 52. As noted previously, during closing arguments defense counsel repeatedly noted and argued the differences between Petitioner's photo, witness descriptions and the composite. *See* RT 2364, 2370-71, 2374. Petitioner also fails to provide any declaration, affidavit, or statement of any kind from trial counsel explaining the reasons for the decisions or actions Petitioner now contests, and offers only his own speculation and unsupported assertions, which do not surmount the strong presumption that counsel acted in a reasonable and strategic manner. *See Strickland*, 466 U.S. at 689.

As to the jury instructions, the Court again agrees with and finds reasonable the state court's determination that trial counsel likely refrained from requesting a jury instruction on character evidence (CALCRIM 350) because the evidence failed to support it. *See id.* Similarly, as to the failure to request a heat of passion manslaughter instruction, because the trial court denied counsel's request for imperfect self-defense instructions based on the lack of evidence supporting such instruction (*see* RT 2070-71, 2226-27; *see*

*also* RT 2504), counsel could have reasonably refrained from requesting a heat of passion instruction because any such request would likely have been denied for the same reasons. *See Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012) ("Counsel is not necessarily ineffective for failing to raise even a nonfrivolous claim, so clearly we cannot hold counsel ineffective for failing to raise a claim that is meritless."), citing *Mirzayance*, 556 U.S. at 127.

With respect to trial counsel's failure to argue provocation and self-defense given the jury was instructed on both (*see* ECF No. 1-3 at 49), it is evident from the record that the defense was focused on identification and the thrust of the defense was to argue reasonable doubt, by contending that witnesses such as Palomino and Aranda had been untruthful in implicating Petitioner and asserting Petitioner had been misidentified and it could not be shown he was even present at the scene that evening. *See e.g.* RT 2374 ("Ladies and gentlemen, [Petitioner] was not at the scene. There's no evidence there. . . .There is not a single shred of physical evidence pointing to [Petitioner] being at the scene. No DNA. No blood. No fingerprints. Hair follicles. Something. Something other than the words of two liars."); *see also e.g.* RT 2375 ("Aranda and Palomino are not credible. We've established that. Eyewitness identifications are unreliable. They are heart-wrenching, but they are unreliable. The composite sketches are unreliable.") Any argument as to provocation or self-defense would have run directly counter to a defense which asserted Petitioner was not even present at the scene. Given the Court must "evaluate the conduct from counsel's perspective at the time," *Strickland*, 466 U.S. at 689, it appears reasonable for counsel to refrain from arguing two inconsistent defense theories to instead advance what he perceived to be the stronger theory, given the credibility issues of Aranda and Palomino and the lack of record evidence about Petitioner's state of mind that could serve to support any self-defense or provocation theory of the crime. *See also id.* ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court,

examining counsel's defense after it has proven unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.")

In sum, on this record the Court is unable to conclude trial counsel's performance fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690; *see also id.* at 689 ("Judicial scrutiny of counsel's performance must be highly deferential.") As such, it is also apparent that the state court's rejection of this claim for lack of demonstrated deficient performance in violation of *Strickland* was reasonable. *See Richter*, 562 U.S. at 101 ("The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.")

While the state court's rejection of this claim was primarily based on Petitioner's failure to satisfy the *Strickland* performance prong (*see* ECF No. 14-46 at 52), to the extent Petitioner was somehow able to show the state court's decision was unreasonable in this respect, this claim also fails for lack of prejudice. *See Mirzayance*, 556 U.S. at 122 ("[A] defendant must show both deficient performance by counsel and prejudice in order to prove that he has received ineffective assistance of counsel."), citing *Strickland*, 466 U.S. at 687. This is because Petitioner fails to show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Again, the Court previously found no prejudice from the alleged instructional errors. *See* Claims 2, 5-6, 8, *supra*. In so deciding, the Court also concluded the jury necessarily rejected any potential self-defense claim and instead clearly found the crimes were committed with both premeditation and deliberation. *See id.* Given the Court previously found no misconduct in the prosecutor's arguments to the jury (*see* Claim 9, *supra*), it also follows that any failure to object, even if somehow found unreasonable, could not have resulted in prejudice. Even considering these purported deficiencies together, the Court finds no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

For the reasons discussed above, Petitioner fails to show the state court decision was contrary to or an unreasonable application of clearly established federal law under *Strickland*. *See Richter*, 562 U.S. at 101 ("The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable.") Petitioner's claim of ineffective assistance of counsel also fails for lack of prejudice. *See id.*; *see also Mirzayance*, 556 U.S. at 122 ("[A] defendant must show both deficient performance by counsel and prejudice in order to prove that he has received ineffective assistance of counsel."), citing *Strickland*, 466 U.S. at 687. Accordingly, habeas relief is not available on Claim 10.

## K.   Claim 11- Cumulative Error

Next, Petitioner contends the cumulative effect of the numerous errors rendered his defense less persuasive and resulted in a fundamentally unfair trial. ECF No. 1 at 23, ECF No. 1-3 at 52.

The Court again looks to the decision of the state appellate court, which held:

> Because Samaniego failed to meet his burden to demonstrate ineffective assistance of counsel, the ineffective assistance of claim does not form a basis for his cumulative error charge. We concluded *ante* that most of the claims of error lacked merit, and as we explain *post*, the court did not err in denying the *Marsden* requests. The only error we found regarded the inclusion of CALCRIM No. 3471. Even accepting this instruction as erroneously offered, the result was not prejudicial to Samaniego. Because the court committed no other error, the cumulative error doctrine has no application. *People v. McWhorter* (2009) 47 Cal.4th 318, 377 (no cumulative error when no error); *People v. Butler* (2009) 46 Cal.4th 847, 855 (rejecting cumulative effect claim when court found "no substantial error in any respect"). Accordingly, we conclude there is no due process violation here. See *People v. Holt* (1984) 37 Cal.3d 436, 458 (cumulative error claim assessed for reasonable probability of more favorable result).

ECF No. 14-46 at 53-54.

"The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007), citing *Chambers v.*

*Mississippi*, 410 U.S. 284, 290 n.3 (1973); *see also Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002) ("[E]ven if no single error were prejudicial, where there are several substantial errors, 'their cumulative effect may nevertheless be so prejudicial as to require reversal.'"), quoting *United States v. de Cruz*, 82 F.3d 856, 868 (9th Cir. 1996).

While the state court's analysis only noted and considered the error in instructing the jurors with CALCRIM 3471 (*see also* Claim 5, *supra*), in an abundance of caution the Court also considers any error arising from the trial court's refusal to hold a hearing on one of Petitioner's requests for a *Marsden* hearing (*see* Claim 3, *supra*), and the prosecutor's disapproved of comments about justice in closing arguments (*see* Claim 9, *supra*). Even after examining these asserted errors cumulatively, Petitioner fails to show that his federal constitutional rights were violated such that reversal is warranted. As noted earlier, the prosecutor's references, when considered in context, did not rise to the level of prejudicial misconduct and the denial of a *Marsden* hearing on one occasion and failure to follow up on Petitioner's complaints about counsel on another was not prejudicial given the trial court held hearings on several subsequent occasions and there was ultimately no error in denying Petitioner's requests for the substitution of counsel. Thus, even considering those events together with the jury instructional error, the Court finds no error which "rises to the level of a constitutional violation or would independently warrant reversal." *Parle*, 505 F.3d at 927, citing *Chambers*, 410 U.S. at 290 n.3.

Petitioner fails to demonstrate the state court decision was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable factual determination. Claim 11 does not merit federal habeas relief.

## L.    Claim 12- Denial of Request for Resentencing

Finally, Petitioner contends the state court erred in denying his request for resentencing in violation of his federal due process rights. ECF No. 1 at 24, ECF Nos. 1-4, 1-5. Respondent maintains habeas relief is unavailable because Petitioner failed to present this claim to the California Supreme Court and because in any event, the state

superior court's ruling that Petitioner is statutorily ineligible for resentencing is binding on this Court. ECF No. 13-1 at 36-37.

"[A] state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus." *Picard v. Connor*, 404 U.S. 270, 275 (1971); *see also* 28 U.S.C. §§ 2254(b) and 2254(c). "[O]nce the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied." *Picard*, 404 U.S. at 275. "In order to 'fairly present' an issue to a state court, a petitioner must 'present the substance of his claim to the state courts, including a reference to a federal constitutional guarantee and a statement of facts that entitle the petitioner to relief.'" *Gulbrandson v. Ryan*, 738 F.3d 976, 992 (9th Cir. 2013), quoting *Scott v. Schriro*, 567 F.3d 573, 582 (9th Cir. 2009). To exhaust, a California prisoner must provide the California Supreme Court an opportunity to rule on the merits of all claims to be brought in federal court. *See Rose v. Lundy*, 455 U.S. 509, 515 (1982); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.")

Petitioner asserts he raised Claim 12 in the California Supreme Court but cites only to the case numbers for his petition for resentencing and habeas petition, both of which were filed in different departments of the state superior court and were both denied. *See* ECF No. 1 at 24. Petitioner also cites to and has attached copies of those denials as exhibits to the Petition, which he appears to assert is the result of raising the claim in the state supreme court. *See id.*; *see also* ECF Nos. 1-4, 1-5. A review of the record reflects that following the trial court's denial of his resentencing petition, Petitioner's counsel submitted a brief on his behalf to the California Court of Appeal indicating that it had "found no arguable issues." ECF No. 14-49 at 10. After advising Petitioner that he could submit a supplemental brief and that in the absence of any such brief, the appeal could be dismissed as abandoned, the California Court of Appeal subsequently dismissed the appeal. ECF No. 14-50. Because there is no record indication Petitioner ever sought relief

in the California Supreme Court on this claim, the Court must therefore conclude Claim 12 remains unexhausted.

Petitioner's failure to exhaust does not preclude the Court from adjudicating this claim, because for the reasons discussed below, the contention also clearly fails to merit habeas relief. While relief may not be granted on an unexhausted claim, the Court may exercise discretion to deny a claim on the merits despite a petitioner's failure to fully exhaust state judicial remedies. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *Gatlin v. Madding*, 189 F.3d 882, 889 (9th Cir. 1999); *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir 2005) ("[A] federal court may deny an unexhausted petition on the merits only when it is perfectly clear that the applicant does not raise even a colorable federal claim.")

Petitioner filed a petition for resentencing pursuant to Cal. Penal Code § 1170.95 in the trial court, which on August 3, 2022, that court denied. ECF No. 1-5 at 15-18. The trial court noted the new state statute provided for resentencing for certain individuals convicted of murder or attempted murder but noted that a petitioner who "was convicted of murder as the actual killer or direct perpetrator" or "was convicted of attempted murder as either the actual perpetrator or as a direct aider and abettor" was not eligible for relief. *Id.* at 16-17. The trial court also found that "the record of conviction makes clear Petitioner [was] convicted of murder and attempted murder as the actual perpetrator, particularly in light of the fact that the jury found true Petitioner personally discharged a firearm during the commission of the killing" and concluded "Petitioner is ineligible for relief as a matter of law." *Id.* at 17.

Again, because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions," any state law error in this decision is not cognizable on federal habeas review. *See McGuire*, 502 U.S. at 67-68; *see also Rhoades*, 611 F.3d at 1142 ("[V]iolations of state law are not cognizable on federal habeas review.") Also, as noted previously, the "[Supreme Court] ha[s] repeatedly held that a

state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Richey*, 546 U.S. at 76, citing *McGuire*, 502 U.S. at 67-68; *Mullaney*, 421 U.S. at 691. A petitioner cannot circumvent this rule by simply asserting the state court's allegedly erroneous decision violated his federal constitutional rights. *See Langford*, 110 F.3d at 1389 ("Langford may not, however, transform a state-law issue into a federal one merely by asserting a violation of due process. We accept a state court's interpretation of state law, and alleged errors in the application of state law are not cognizable in federal habeas corpus.") (internal and external citations omitted). That said, a petitioner's contention that the trial court's sentencing decision in his or her case violated his or her federal constitutional rights could prove cognizable on federal habeas review if the state court decision was "so arbitrary or capricious" that it "constitute[d] an independent due process . . . violation." *Richmond v. Lewis*, 506 U.S. 40, 50 (1992) ("[T]he question to be decided by a federal court on petition for habeas corpus is not whether the state sentencer committed state-law error," but instead, whether the state court decision was "'so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation.'"), quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1994).

While it is not the purview of this Court to re-evaluate the correctness of the state court's determination, the Court recognizes it must construe Petitioner's contentions liberally. *Porter*, 620 F.3d at 958 ("Prisoner pro se pleadings are given the benefit of liberal construction."), citing *Erickson*, 551 U.S. at 94. Even so, Petitioner fails to make any attempt to explain how the trial court's conclusion that he was "ineligible for review as a matter of law" because he was "convicted of murder and attempted murder as the actual perpetrator" (*see* ECF No. 1-5 at 17), was somehow "arbitrary or capricious" such that it could potentially constitute an independent federal due process violation. Petitioner instead asserts, without explanation or specific factual allegations, that the state trial court acted contrary to clearly established federal law in denying his resentencing petition and that due process can be violated and federal relief may be available where a state fails to

follow its own criminal procedures and egregiously errs in its interpretation and application of state law. *See* ECF No. 1 at 24.

These generalized allegations fail to state a federal claim of error. *See e.g. Langford*, 110 F.3d at 1389. Plus, as discussed above, the state court's ruling that Petitioner was not eligible for resentencing under state law because he was convicted of murder and attempted murder as the actual perpetrator is binding on this Court. *See Richey*, 546 U.S. at 76 ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."), citing *McGuire*, 502 U.S. at 67-68; *Mullaney*, 421 U.S. at 691.

Because Petitioner fails to state a cognizable claim of error on federal habeas review, and habeas relief is thus clearly not warranted, the Court denies Claim 12 despite Petitioner's failure to exhaust state judicial remedies. *Gatlin*, 189 F.3d at 889; *Cassett*, 406 F.3d at 624; *McGuire*, 502 U.S. at 67-68; *Rhoades*, 611 F.3d at 1142; *Richey*, 546 U.S. at 76; *Langford*, 110 F.3d at 1389.

## M.   Petitioner's Ancillary Requests

Contemporaneous with the filing of the instant Petition, Petitioner filed a "Notice of Motion for Court to take [Judicial-Notice] of the Below Listed," which included: (1) requesting the Court take judicial notice that Petitioner asserts he is in custody in violation of the federal Constitution and laws and submits the instant habeas petition in an attack upon that custody, (2) requesting the Court issue an order to show cause and declare the rights of the parties, (3) requesting the Court appoint counsel to represent Petitioner and (4) requesting habeas relief. *See* ECF No. 1-2.

With respect to Petitioner's request for judicial notice, "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Thus, "[a] court may take judicial notice of the existence of matters of

public record, such as a prior order or decision, but not the truth of the facts cited therein." *Marsh v. San Diego Cnty.*, 432 F.Supp.2d 1035, 1043 (S.D. Cal. May 5, 2006), citing *Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001). However, Petitioner's request that the Court judicially notice his assertions and request for habeas relief are not facts, but are instead Petitioner's own contentions, and are thus not a proper subject for judicial notice. Accordingly, the Court **DENIES** Petitioner's request for judicial notice.

Turning to Petitioner's request for an order to show cause and to declare the rights of the parties, because for the reasons discussed above, Petitioner has not shown an entitlement to habeas relief, the Court finds an order to show cause unwarranted. Thus, the Court **DENIES** this request. For the same reasons, the Court also **DENIES** Petitioner's request to declare the rights of the parties.

Finally, the Court turns to Petitioner's request for the appointment of counsel. District courts are provided with statutory authority to appoint counsel in a federal habeas case when a petitioner is financially eligible and "the court determines that the interests of justice so require." 18 U.S.C. §3006A(a)(2)(b); *see also Chaney v. Lewis*, 801 F.2d 1191, 1196 (9th Cir. 1986) ("Indigent state prisoners applying for habeas corpus relief are not entitled to appointed counsel unless the circumstances of a particular case indicate that appointed counsel is necessary to prevent due process violations.") (citations omitted). However, in this instance, the Court's review of the instant Petition and other filings reflect Petitioner's ability to articulate his claims and other requests without the assistance of counsel. *See LaMere v. Risley*, 827 F.2d 622, 626 (9th Cir. 1987) (district court did not abuse discretion is declining to appoint counsel where "district court pleadings illustrate to us that [the petitioner] had a good understanding of the issues and the ability to present forcefully and coherently his contentions."); *see also e.g.* ECF Nos. 1, 16, 18, 20. The Court also finds no indication that in this case the appointment of counsel is required or warranted to avoid due process violations. *See Chaney*, 801 F.2d at 1196. As such, the Court **DENIES** Petitioner's request for the appointment of counsel.

## V.    CERTIFICATE OF APPEALABILITY

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C.A. foll. § 2254. "A certificate of appealability should issue if 'reasonable jurists could debate whether' (1) the district court's assessment of the claim was debatable or wrong; or (2) the issue presented is 'adequate to deserve encouragement to proceed further.'" *Shoemaker v. Taylor*, 730 F.3d 778, 790 (9th Cir. 2013), quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). This requirement includes a district court's decision based on procedural grounds. *See Buck v. Davis*, 580 U.S. 100, 122 (2017) ("[A] litigant seeking a COA must demonstrate that a procedural ruling barring relief is itself debatable among jurists of reason; otherwise, the appeal would not 'deserve encouragement to proceed further.'"), quoting *Slack*, 529 U.S. at 484.

In the instant case, the Court finds issuing a certificate of appealability is not appropriate as reasonable jurists would not find debatable or incorrect the Court's conclusion that (1) Claim 1 is not cognizable on habeas review, (2) Claim 9 is procedurally barred, (3) the state court reasonably rejected Claims 2-11, and (4) Claim 12 is not cognizable on habeas review and thus does not warrant relief despite Petitioner's failure to exhaust state judicial remedies, nor does the Court find any of the issues presented deserve encouragement to proceed further. *See* 28 U.S.C. § 2253(c); *Slack*, 529 U.S. at 484.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

82

1

## VI.   CONCLUSION AND ORDER

2

For the reasons discussed above, the Court **DENIES** the Petition for a Writ of

3

Habeas Corpus, **DENIES** Petitioner's ancillary requests [ECF No. 1-2] and **DENIES** a

4

Certificate of Appealability.

5

**IT IS SO ORDERED.**

6

7

Dated:  March 4, 2024

8

_____
Honorable James E. Simmons Jr.
United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28